UNITED STATES of America, Plaintiff–Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN and HELPERS of AMERICA, AFL–CIO; The Commission of La Cosa Nostra; Anthony Salerno, also known as Fat Tony; Matthew Ianniello, also known as Matty the Horse; Anthony Provenzano, also known as Tony Pro; Nunzio Provenzano, also known as Nunzi Pro; Anthony Corallo, also known as Tony Ducks; Salvatore Santoro; Christopher Furnari, Sr., also known as Christie Tick; Frank Manzo; Carmine Persico, also known as The Snake, also known as Junior; Gennaro Langella, also known as Gerry Lang; Philip Rastelli, also known as Rusty; Nicholas Marangello, also known as Nicky Glasses; Joseph Massino, also known as Joey Messina; Anthony Ficarotta, also known as Figgy; Eugene Boffa, Sr.; Francis Sheeran; Milton Rockman, also known as Maishe; John Tronolone, also known as Peanuts; Joseph John Aiuppa, also known as Joey Aiuppa, also known as Joe Doves, also known as Joey O'Brien; John Phillip Cerone, also known as Jackie Cerone, also known as Jackie the Lackie; Joseph Lombardo, also known as Joey the Clown; Angelo LaPietra, also known as Nutcracker, The; Frank Balistrieri, also known as Mr. B; Carl Angelo DeLuna, also known as Toughy; Carl Civella, also known as Corky; Anthony Thomas Civella, also known as Tony Ripe; General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, also known as Joe T. First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice President; Joseph W. Morgan,

16

Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J. Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; Salvatore Provenzano, also known as Sammy Pro, Former Vice President, Defendants,

Kenneth Morrill; Frank Scopino; William Warner; Dennis Shippee; Glen Lawton and Burton S. Rosenberg, Appellants.

No. 880, Docket 92–6268.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1992.

Decided Feb. 16, 1993.

John R. Williams, New Haven, CT (Williams & Wise, of counsel), for appellants.

Peter C. Sprung, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., Christine H. Chung, Gabriel W. Gorenstein, Asst. U.S. Attys., of counsel), for plaintiff-appellee.

Before OAKES and WINTER, Circuit Judges, and SOTOMAYOR,* District Judge.

* Honorable Sonia Sotomayor, District Judge for the United States District Court for the Southern District of New York, sitting by designation.

OAKES, Circuit Judge:

Appellants, current and former officers of Local 493, International Brotherhood of Teamsters (the "IBT") and the former attorney for Local 493, appeal from a decision of the United States District Court for the Southern District of New York, David N. Edelstein, *Judge,* to enforce the terms of an agreement settling a civil contempt action brought by the United States of America (the "Government"). The civil contempt action stemmed from charges filed by the Investigations Officer against the Local 493 officers under the terms of a consent decree. Appellants argue that their attorneys did not have the authority to enter into any settlement agreement, that the district court violated their due process rights by denying them an evidentiary hearing, and that the district court displayed bias in its handling of the case. We affirm.

## I. *BACKGROUND*

In June 1988, the Government filed suit under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations statute, ("RICO"), 18 U.S.C. § 1964(b) (1988), against the IBT, its General Executive Board, Executive Board members, the Commission of La Cosa Nostra and twenty-seven members and associates of La Cosa Nostra. *See United States v. International Bhd. of Teamsters,* 931 F.2d 177, 180–81 (2d Cir.1991) (summarizing history of this litigation).

The Government's action against the IBT was settled in a voluntary consent order of March 14, 1989 (the "Consent Decree"). Under the Consent Decree, three appointed officials are to monitor the IBT's efforts to rid itself of the influence of organized crime: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral

process leading up to and including the 1991 election for International Officers.

Kenneth Morrill, Frank Scopino, William Warner, Dennis Shippee, Glen Lawton (the "Local 493 officers") and Burton Rosenberg, Esq., the Local's former attorney, now appeal from a judgment entered on October 27, 1992 by the district court. The judgment implements an October 27, 1992 Opinion and Order which granted the Government's motion to enforce a written settlement agreed to by appellants on May 2, 1991 (the "Settlement"). The Settlement concluded a civil contempt proceeding brought by the Government against appellants for violating a court-approved agreement (the "Agreement") resolving disciplinary charges against the Local 493 officers under the Consent Decree.

On November 5, 1990, the Investigations Officer charged the Local 493 officers with bringing reproach upon the IBT by failing to perform their duties as union officers and by embezzling $107,273 in union funds for the use of a fellow officer, Philip Guarnaccia. The Local 493 officers gave Guarnaccia, the former Secretary–Treasurer of Local 493, the $107,273 in the form of severance payments after he had been convicted of willfully failing to maintain accurate and complete union records, in violation of federal labor laws.[1]

On January 17, 1991, the district court approved the Agreement under which the Local 493 officers agreed to repay the union $65,000 if Guarnaccia failed to pay. In addition, the Local 493 officers agreed to "propose to and support before the [Local 493 Executive] Board and after its passage to the Local 493 membership" an amendment (the "Amendment") to the Local's bylaws and constitution concerning limits on the amount and type of permissible severance payments. Under Local 493's bylaws, the Amendment had to be read at two

---

1. Guarnaccia was convicted on July 10, 1987. On November 5, 1990, the Investigations Officer charged Guarnaccia with bringing reproach upon the IBT through his failure to perform duties as a union officer and his embezzlement of $107,273 of the local's money. The district

court approved a settlement of the charges on January 16, 1991 in which Guarnaccia agreed to reimburse Local 493 $65,000, to resign as shop steward, and not to seek or accept election or appointment to union office for two years.

consecutive general membership meetings before presentation for a vote.

According to the Government, the Local 493 officers did not uphold their side of the bargain concerning their duty to present the Amendment to the membership. First, the Local 493 officers did not enact a severance pay resolution as required in the Agreement. Second, their presentation of the Amendment to the membership violated the spirit if not the terms of the Agreement. Donald Villa, a member of Local 493, informed the Government that, at the first reading of the Amendment, appellant Morrill told the membership that "Carberry's Office" (Carberry is the Investigations Officer under the Consent Decree) wrote the Amendment and that "we have to read this and recommend it to you." Further, the Government learned from another member of Local 493, that at the second reading of the Amendment, appellant Scopino declared that the Local 493 officers had signed the Agreement under duress and that while "we have to recommend it to you," the membership did not have to approve it.

At the final reading before the vote, attorney Burton Rosenberg was reported to have told the assembled membership that the officers had done no wrong and were forced by the Government to settle the charges. In addition, it was alleged that he told the membership that the Amendment limited "the compensation of your officials when they leave office, when in fact you, the membership want to reward them with compensation and other items as you've done in the past." He then urged the membership to vote down the Amendment. Morrill followed Rosenberg, adding that the membership was free to vote against the Amendment and that both he and Scopino urged that they do so. Immediately afterward, Scopino allegedly tried to close discussion and hold a vote on the Amendment. After objecting to this procedure, John Sarantopolous, a member of Local 493, was allowed to speak in support of the Amendment. Several of the Local 493 officers allegedly tried to shout him down. In an open vote, the membership rejected the Amendment 94 to 32.

On April 29, 1991, the Government, based on the allegations made by members Villa and Sarantopolous, brought an order to show cause why the Local 493 officers should not be held in contempt of the January 17, 1991 Agreement. The order was signed by the district court and an evidentiary hearing scheduled for May 1, 1991. As the parties had reached a settlement (the "Settlement") by that date, the Government presented no evidence of contempt. The terms of the Settlement are contained in a letter from the Government to the attorneys for the Local 493 officers, dated May 2, 1991 and include a requirement that the Local 493 officers pass an Executive Board resolution adopting the Amendment and present it to the general membership for a secret-ballot vote, supervised by the Government. In addition, the Local 493 officers agreed not to accept severance pay in an amount greater than that set forth in the resolution, to remove attorney Rosenberg and his law firm from all Local 493 matters and to reimburse the Local for legal fees expended in connection with the disciplinary and contempt proceedings. The Local 493 officers also agreed to defray the Government's costs and attorney's fees for the contempt proceeding and to include in the formal settlement of the contempt action an admission that they violated the Agreement. Marc Bogatin, Esq., the attorney for the Local 493 officers, and Jerome Tauber, Esq., the attorney for Rosenberg, both stated before the court that their clients had accepted the terms of the Settlement and had authorized the lawyers to present this acceptance to the court. At the district court's direction, the Government prepared a stipulation and order embodying the terms of the Settlement.

After the May 2, 1991 hearing, the Local 493 officers convened n Executive Board meeting in Manhattan and fulfilled two of the obligations of the Agreement: they enacted the severance pay resolution as set forth in the agreement and also bound themselves not to receive severance pay in excess of the amount set in the resolution.

On May 17, 1991, the attorney for the Local 493 officers informed the Govern-

ment that his clients would be willing to resign their posts rather than carry out the remaining terms of the Settlement. The Government did not reply until February 25, 1992, when it sent a letter outlining the terms under which the resignations would be accepted as a substitute for the Settlement, but only after reiterating the terms of the original Agreement. The February 25 letter required the appointment of a temporary trustee until new officers were elected as well as the termination of attorney Rosenberg and his firm. The letter concluded by stating that "[i]f these terms are unacceptable to your clients ... the Government will immediately apply to the Court to enforce the terms of the May 2 agreement."

The Government conducted negotiations with the Local 493 officers' new (and current) attorney, John R. Williams, Esq., from February through July, 1992, to establish terms for a settlement of the contempt proceeding which would include the resignations of the Local 493 officers. Three of the Local 493 officers, Warner, Shippee, and Lawton resigned during this period. Attorney Williams wrote to the Government on June 19, 1992, that "I have reviewed your letter of June 9, [1992] and I believe we may have an agreement here." Nonetheless, the Local 493 officers refused to execute the stipulation forwarded by the Government embodying their acceptance of the new terms.

On August 4, 1992 the Government moved for an entry of judgment enforcing the terms of the Settlement contained in the May 2, 1991 letter. The Government argued that the Local 493 officers, through their conduct at the membership meetings, violated their duties under the Agreement to support the Amendment. In response, the Local 493 officers argued that (1) the district court lacked jurisdiction over them because of inadequate service of process; (2) the parties abandoned the Settlement by later engaging in negotiations; (3) the Government's motion was barred by laches; and (4) it was impossible to comply with the terms of the Settlement requiring action by the Executive Board. The Government's motion was argued on October 13, 1992.

At that time, the district court ordered a stay of the Local 493 election scheduled for October 18, 1992. In an opinion dated October 27, 1992, the district court granted the motion for enforcement.

The Local 493 officers and Rosenberg appeal Judge Edelstein's decision on three grounds: (1) their attorney had no authority to enter into the Settlement on May 2, 1991; (2) the district court denied them due process in its refusal to hold an evidentiary hearing on the authority of the attorney to enter into the Settlement; and (3) the district court showed evidence of bias. We find these arguments to be without merit and therefore we affirm the district court's findings.

## II. *DISCUSSION*

■ The Supreme Court recognized long ago that the decision to settle a case rests with the client alone. *United States v. Beebe*, 180 U.S. 343, 350–53, 21 S.Ct. 371, 374–75, 45 L.Ed. 563 (1901). This circuit has reiterated the principle on many occasions. *Fennell v. TLB Kent Co.*, 865 F.2d 498, 501–02 (2d Cir.1989); *Thomsen v. Terrace Navigation Corp.*, 490 F.2d 88, 89 (2d Cir.1974); *Barthelmas v. Fidelity–Phenix Fire Ins. Co.*, 103 F.2d 329, 331 (2d Cir. 1939). *See also* ABA Model Rules of Professional Conduct Rule 1.2(a) (1992); ABA Model Code of Professional Responsibility EC 7–7 (1983).

■ The Local 493 officers and attorney Rosenberg argue that neither attorney Marc Bogatin nor attorney Jerome Tauber, the attorneys who appeared at the May 2, 1991 hearing, had the authority to enter into a settlement agreement. In support, they cite the holding in *Fennell* that only a client can make the final determination whether to settle. While such a reading is undoubtedly correct, it is incomplete. In that case, we also stated that "if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld." *Fennell*, 865 F.2d at 502; *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir.1989), *cert. denied*, 498 U.S. 865, 111

S.Ct. 177, 112 L.Ed.2d 141 (1990); *see also* Restatement of the Law Governing Lawyers ch. 2, §§ 38, 39 (Tent.Draft No. 5, 1992).

■ In a case arising under federal law, the scope of an agent's authority is determined according to federal precedent. *Fennell,* 865 F.2d at 501. The burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial. *Surety Ins. Co. of Cal. v. Williams,* 729 F.2d 581, 583 (8th Cir. 1984); *Gilbert v. United States,* 479 F.2d 1267, 1268–69 (2d Cir.1973). In this case, the facts demonstrate that the attorney for the Local 493 officers had both actual and apparent authority to settle the contempt charges.

The lawyer-client relation being one of agent-principal, Restatement of the Law Governing Lawyers ch. 2, Introductory Note (Tent.Draft No. 5, 1992), actual authority " 'may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act.' " *Edwards v. Born, Inc.,* 792 F.2d 387, 391 (3d Cir.1986) (quoting Restatement (Second) of Agency § 26 cmt. c (1958)). We agree with the district court that the Local 493 officers' conduct after the May 2, 1991 Settlement was inconsistent with their current argument that their attorneys lacked actual authority. First, the Local 493 officers' attorney stated in open court that his clients had given him the authority to agree to the proposed Settlement. Second, the Local 493 officers offered, through their attorney, to resign, a term not included in the Agreement or the Settlement. Third, further negotiations ensued between the Government and the Local 493 officers as a result of the officers' new proposal. Three of them subsequently resigned. Such behavior underscores the belief that their attorney had operated under their guidance. Finally, the Local 493 officers' current attorney, John Williams, in all of his correspondence with the Government never asserted that the Settlement was invalid owing to lack of authority. Although retained in February of 1992, he did not raise this concern until October, 1992 in the hearing on the Government's motion to enforce the judgment. Even as late as August 11, 1992, attorney Williams sent the district court a letter detailing the reasons why the court ought not to enforce this Settlement but he failed to include lack of authority as one of those reasons.

■ Were we not so convinced that the officers' attorney had actual authority, we would not hesitate to find apparent authority. Apparent authority is "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1958). It is the law in this circuit, as well as generally, that customarily only the representation of the principal to the third party can create apparent authority, not the representation of the agent alone. *Fennell,* 865 F.2d at 502; *see also* Restatement (Second) of Agency § 27 (1958). In *Fennell,* this court found that the plaintiff's attorney did not have apparent authority to settle and that, therefore, the settlement was not binding on the client. *Fennell,* 865 F.2d at 502. The circumstances in *Fennell,* however, were completely different: a "settlement agreement was reached in a telephone conference by counsel in which no party participated and Fennell made prompt objections to that agreement upon being advised as to its terms." *Id.* at 503.

In this case, the Local 493 officers themselves indicated their belief in their attorney's authority to settle. After the Settlement was agreed upon, attorney Bogatin came forward at their instance with the proposition that they resign their positions, the same attorney whom they now allege had no authority to conclude the underlying Settlement. Negotiations continued based on this new development. Further, their current attorney, Williams, has had an extensive correspondence with the Government during these negotiations. The Local 493 officers waited sixteen months after the date of the Settlement before attempting to deny attorney Bogatin's au-

thority. *See Beirne v. Fitch Sanitarium, Inc.*, 167 F.Supp. 652, 654 (S.D.N.Y.1958) ("It is a client's duty to express disapproval of a settlement within a reasonable time, if he has a basis for disapproval. If he does not object he makes the settlement his own"). The Local 493 officers cannot be heard now to assert that the Settlement took them by surprise.

 The Local 493 officers' second argument is that they were denied due process when Judge Edelstein refused to grant them an evidentiary hearing on the question of their attorney's authority. The Local 493 officers argue that Judge Edelstein violated their rights by determining disputed questions of fact without any evidence before him. In a similar case, the Third Circuit determined the appropriate standard of review for the denial of an evidentiary hearing. "Summary enforcement was proper if any ground indisputably provides a basis for [Bogatin's] authority, so that even taking plaintiffs' assertions as true, the settlements are valid." *Tiernan v. Devoe*, 923 F.2d 1024, 1037 (3d Cir.1991). We find that there was adequate evidence to find either actual or apparent authority, giving the Local 493 officers the benefit of every inference. Judge Edelstein had, in addition to the transcript of the May 2, 1991 hearing, copies of the voluminous correspondence between the parties. Moreover, the Local 493 officers never made an offer of proof regarding a lack of apparent authority.

Lastly, the Local 493 officers contend that Judge Edelstein's demeanor and remarks during the course of the proceeding conveyed an improper bias and that the case should be remanded to another judge. This case will not be remanded as we are affirming the district court's findings of fact and conclusions of law. Nonetheless, we address this allegation. Although we regret the judge's use of language that was overly abrupt, we do not believe that Judge Edelstein displayed an improper bias. After perusing the record, we do not find any evidence of bias as the judge was equally harsh to, or short with, the attorneys from both sides. And, while the judge's court could never be likened to Boccaccio's Bengodi,[2] neither was the IBT litigation calculated to turn a judicial officer into Dickens' Mark Tapley.[3]

### III.  *CONCLUSION*

We affirm the order of the district court enforcing the Settlement.

---

**2.** This is a land of plenty mentioned in Boccaccio's *Decameron* "where they tie up vineyards with sausages and where you can have a goose for a dime and a gosling thrown in with it, and that there was a mountain there made entirely of grated Parmesan cheese upon which there lived people who did nothing but make macaroni and ravioli which they cook in capon broth and which they then cast down upon the ground, and whoever picks up the greater part of it gets the most; and nearby there flowed a stream of sweet white wine, the best that was ever tasted, without a drop of water in it." Giovanni Boccaccio, *The Decameron* 123 (Mark Musa & Peter E. Dondanella eds. & trans., W.W. Norton & Co. 1977) (1351).

**3.** Mark Tapley, in Charles Dickens' *Martin Chuzzlewit* (Oxford University Press 1959) (1844), was capable of being cheerful under all circumstances.