19-0783-cr(L)
*United States v. Gatto et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2019

(Argued: March 13, 2020      Decided: January 15, 2021)

Docket Nos. 19-0783-cr; 19-0786-cr; 19-0788-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

JAMES GATTO, aka Jim, MERL CODE, CHRISTIAN DAWKINS,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:
LYNCH AND CHIN, *Circuit Judges*, and ENGELMAYER, *District Judge.**

---

*       Judge Paul A. Engelmayer, of the United States District Court for the Southern District of New York, sitting by designation.

Consolidated appeals from judgments of the United States District Court for the Southern District of New York (Kaplan, *J.*), convicting defendants-appellants of wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1349.  The government alleged that defendants-appellants engaged in a scheme to defraud universities of athletic-based financial aid when they made secret cash payments to the families of college basketball recruits, thereby rendering the recruits ineligible to play for the universities.  On appeal, defendants-appellants contend that there was insufficient evidence to sustain their wire fraud convictions.  Additionally, they challenge several of the district court's evidentiary rulings as well as portions of its instructions to the jury.

AFFIRMED.

Judge LYNCH CONCURS IN PART and DISSENTS IN PART in a separate opinion.

---

EDWARD B. DISKANT, Assistant United States Attorney (Aline R. Flodr, Eli J. Mark, Noah D. Solowiejczyk, and Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the  Southern District of New York, New York, New York, *for Appellee*.

MICHAEL S. SCHACHTER (Casey E. Donnelly, *on the brief*), Willkie Farr & Gallagher LLP, New York, New York, *for Defendant-Appellant James Gatto.*

Andrew A. Mathias, Nexsen Pruet, LLC, Greenville, South Carolina, *for Defendant-Appellant Merl Code.*

Steven Haney, Haney Law Group, PLLC, Southfield, Michigan, *for Defendant-Appellant Christian Dawkins.*

CHIN, *Circuit Judge*:

In this case, defendants-appellants James Gatto, Merl Code, and Christian Dawkins ("Defendants") were convicted of engaging in a scheme to defraud three universities by paying tens of thousands of dollars to the families of high school basketball players to induce them to attend the universities, which were sponsored by Adidas, the sports apparel company, and covering up the payments so that the recruits could certify to the universities that they had complied with rules of the National Collegiate Athletic Association (the "NCAA") barring student-athletes and recruits from being paid.

At trial, Defendants admitted that they engaged in the scheme and broke NCAA rules, but argued that what they did was not criminal. On appeal,

- 3 -

they contend that the government failed to prove that they intended to defraud the universities -- North Carolina State University ("N.C. State"), the University of Kansas ("Kansas"), and the University of Louisville ("Louisville") (collectively, the "Universities") -- and that their intent instead was to help the Universities by bringing them top recruits to ensure winning basketball programs. They contend that, "in the real world, . . . universities engage in an all-out arms race to recruit the best talent, motivated by the tens of millions of dollars that can be earned each year by a successful men's basketball program," Appellants' Br. at 98 (internal quotation marks omitted), and that they "broke NCAA rules out of a genuine desire to see the Universities' basketball teams succeed," Appellants' Br. at 96. They argue that under-the-table payments to student-athletes are widespread in college sports, and that, indeed, many college coaches are aware of and endorse the practice. And they argue, as they did in their opening statements at trial, that "[t]he kids on the court, . . . the ones whose blood, sweat and tears is making this game a billion dollar industry, they are not allowed to earn a dime." App'x at 107.

We have no doubt that a successful men's basketball program is a major source of revenue at certain major universities, but we need not be drawn

into the debate over the extent to which college sports is a business.[1]  Instead, our task is to determine whether the government proved beyond a reasonable doubt that Defendants knowingly and intentionally engaged in a scheme, through the use of wires, to defraud the Universities of property, *i.e.*, financial aid that they could have given to other students.  We conclude that the government did.  We also reject Defendants' arguments that the district court abused its discretion in its evidentiary rulings and committed reversible error in its instructions to the jury.  Accordingly, we affirm.

## *BACKGROUND*

On appeal from a conviction following a jury trial, the "facts are drawn from the trial evidence and described in the light most favorable to the government."  *United States v. Wilson*, 709 F.3d 84, 85 (2d Cir. 2013).

---

[1]      We are mindful of the fair concerns raised in this respect by Judge Lynch in his separate opinion.  Nonetheless, as he acknowledges, this case is not the proper vehicle for resolving the longstanding, controversial debate over whether college athletes should be paid.  For a history of that debate, *see generally* W. Burlette Carter, *The Age of Innocence: The First 25 Years of the National Collegiate Athletic Association, 1906 to 1931*, 8 Vand. J. Ent. & Tech. 211 (2006) (outlining the origins and early controversies of NCAA amateurism); Christopher M. Parent, *Forward Progress? An Analysis of Whether Student-Athletes Should Be Paid*, 3 Va. Sports & Ent. L.J. 226 (2004) (discussing the desirability and feasibility of paying student-athletes); *see also* Alfred Dennis Mathewson, *The Eligibility Paradox*, 7 Jeffrey S. Moorad Sports L.J. 83, 86 n.11-12 (2000) (citing scholarship against and in support of amateurism in the NCAA).

**I.**     *The Landscape*

The NCAA is a private organization that oversees collegiate sports in America.  It promulgates rules that its member universities must follow, among which is the requirement that all student-athletes must remain amateurs to be eligible to compete for their schools.  This means that the student-athletes -- and their families -- may not accept payments of any form for the student-athletes' playing or agreeing to play their sport.  This rule extends from the time when the student-athletes are still in high school and are being recruited to play at the collegiate level.

There are, however, exceptions.  Colleges are permitted, for example, to offer athletic-based aid to a certain number of student-athletes, to cover tuition, room, and board.  And the schools themselves are permitted to enter into sponsorship agreements with sports apparel brands, which allow them to provide their student-athletes with clothing and footwear that they receive from their corporate sponsors.  Essentially, these sponsorship agreements are marketing deals.  Major sports apparel brands, including Adidas, Nike, and Under Armour, enter into such contracts to promote their brands.  Under these agreements, student-athletes must wear the brand of the company their school

has partnered with when they compete for their school -- that is, at practice and during games.

## II.   *The Scheme*

Gatto was Adidas's director of global sports marketing for basketball. He managed the sports marketing budget, and part of his job entailed overseeing the relationship that Adidas had with various schools, including N.C. State, Kansas, and Louisville. This included helping to ensure the success of the sponsorship agreements Adidas signed with the Universities pursuant to which Adidas paid the Universities for the right to provide their NCAA sports teams with Adidas apparel.

Gatto worked with Code and Thomas Joseph Gassnola, both Adidas consultants. He also worked informally with Dawkins, an aspiring sports agent, and Munish Sood, a financial advisor. Together, these men paid the families of top-tier high school basketball recruits -- including Dennis Smith Jr., Billy Preston, and Brian Bowen Jr. (collectively, the "Recruits") -- to entice those players to enroll at one of the Universities. This activity violated NCAA rules, and if the NCAA were to discover the payments, the players would not be permitted to play in games and the Universities would be subject to penalties.

As a result, Defendants and those who assisted them concealed these payments by falsifying Adidas invoices to make it seem as though the payments were going to youth basketball teams affiliated with the Amateur Athletic Union ("AAU"), a non-profit, multi-sport organization that, among other things, facilitates youth basketball tournaments. In reality, the money was being funneled through AAU teams with which some Defendants were affiliated to the families of top basketball prospects. In addition to creating fake expense reports to mask these payments, Defendants used phones that were not registered in their names while communicating with the Recruits' families.

Per the NCAA bylaws, every member institution must certify that its prospective student-athletes are amateurs and thus eligible to compete. Consequently, the Universities required all their recruits to sign paperwork attesting that they were aware of and in compliance with the NCAA bylaws. By signing the certifications, the recruits affirmed, among other things, that they had not used their "athletics skill (directly or indirectly) for pay in any form in that sport." App'x at 780. A recruit's athletic-based aid was contingent upon his certifying his eligibility. Those in charge of compliance at the Universities explained that they would have never awarded athletic-based aid to the Recruits

had they known they were ineligible to compete, and the head coaches' contracts required the coaches to be stewards of the NCAA rules and report any suspected violations.

**A.**   *N.C. State*

Smith verbally committed to play basketball for N.C. State in September 2015.  At the time, he was one of the top recruits in North Carolina, but, according to Gassnola, there were rumors that he was going to change his mind about which college he would attend.  To ensure that Smith enrolled at N.C. State, Gassnola gave the Smith family $40,000 in the Fall 2015.  He was reimbursed by Adidas via Gatto, who filed false invoices to facilitate the repayment.  Shortly after the Smith family received the $40,000 payment, Smith signed forms enrolling at N.C. State indicating that he was compliant with the NCAA eligibility rules.  He played one season at N.C. State before being selected as the ninth overall pick in the 2017 NBA Draft.

**B.**   *Kansas*

Preston verbally committed to play for Kansas in Fall 2016.  After Preston committed, however, Gassnola heard that the Preston family was accepting money from sports agents and financial advisors, thereby putting

Preston's eligibility in jeopardy. Because, according to Gassnola, he thought that he was better-equipped to prevent illicit payments from being discovered, Gassnola arranged to pay the Preston family to stop them from taking money from others and preserve Preston's NCAA eligibility. With Gatto's permission, Gassnola paid the Preston family around $50,000. Gassnola paid the money and then, with the help of Gatto, submitted false AAU expense reports to Adidas for reimbursement. In November 2016, Preston signed forms indicating that he was compliant with the NCAA eligibility rules. His ineligibility, however, was discovered, and he never played for Kansas.

### C. *Louisville*

Bowen committed to play for Louisville in May 2017. Around the same time, Bowen's family agreed to accept $100,000 from Adidas, to be paid in four installments. These payments were to be funneled through an AAU program with which Code was affiliated. On June 1, 2017 and June 9, 2017, Bowen signed forms accepting athletic-based aid and indicating that he was compliant with the NCAA eligibility rules. Around a month later, on July 13, 2017, Bowen's father was paid the first installment of $25,000. Defendants were arrested before any other payments were made, and Bowen, whom Louisville

decided to withhold from competition, withdrew from Louisville after one semester to play professional basketball.

**III.    *Procedural History***

Defendants were charged in a superseding indictment filed on August 14, 2018 with wire fraud and conspiracy to commit wire fraud for the role they played in recruiting Smith, Preston, and Bowen.  Trial began on October 1, 2018.  Defendants objected to certain of the district court's evidentiary rulings as well as to portions of its instructions to the jury.  On October 24, 2018, the jury found Defendants guilty of wire fraud and conspiracy to commit wire fraud.  On January 17, 2019, the district court issued an opinion explaining some of its evidentiary rulings.  Defendants were sentenced in March 2019 -- Gatto principally to nine months' imprisonment and Code and Dawkins principally to six months' imprisonment each.  The district court also ordered Defendants to pay restitution to the Universities for their actual losses in awarding athletic scholarships to the Recruits.

This appeal followed.

*DISCUSSION*

On appeal, Defendants raise three principal arguments: (1) there was insufficient evidence to sustain their wire fraud and conspiracy to commit wire fraud convictions; (2) the district court abused its discretion in excluding evidence; and (3) the district court erroneously instructed the jury. We address these issues in turn.

## I. *Sufficiency of the Evidence*

### A. *Applicable Law*

"We review the sufficiency of the evidence *de novo*." *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014). A defendant "bears a heavy burden" when he tries to "overturn a jury verdict on sufficiency grounds," as we draw all reasonable inferences in the government's favor and defer to the jury when there are "competing inferences." *Id.* at 59-60 (internal quotation marks omitted). A challenge to the sufficiency of the evidence fails if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To convict a defendant of wire fraud, the government must prove beyond a reasonable doubt: "(1) a scheme to defraud, (2) money or property as

the object of the scheme, and (3) use of the . . . wires to further the scheme."

*United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015); *see also* 18 U.S.C. § 1343.

Here, the parties do not dispute the third element.[2]

As to the "scheme to defraud" element, there must be "proof that

defendants possessed a fraudulent intent." *United States v. Starr*, 816 F.2d 94, 98

(2d Cir. 1987).  Accordingly, defendants must either intend to harm their victim

or contemplate that their victim may be harmed.  *Id.* ("Although the government

is not required to prove actual injury, it must, at a minimum, prove that

defendants *contemplated* some actual harm or injury to their victims.  Only a

showing of intended harm will satisfy the element of fraudulent intent.").

Although as a general matter "contemplate" can mean either "to think about" or

"to have in view as a purpose," we have clarified that only the latter definition

comports with the "fraudulent intent" requirement for conviction.  *United States

v. Gabriel*, 125 F.3d 89, 97 (2d Cir. 1997).  This distinction often "poses no

additional obstacle for the government" because "fraudulent intent may be

inferred from the scheme itself" if "the necessary result of the actor's scheme is to

---

[2]      Indeed, Defendants were recorded discussing the scheme over the phone, and they emailed about creating invoices to facilitate the payments.  Moreover, at least two of the payments were wired to Preston.

- 13 -

injure others." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (internal quotation marks omitted).  Further, "[i]ntent may be proven through circumstantial evidence, including by showing that [a] defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999); *see also United States v. MacPherson*, 424 F.3d 183, 189-90 (2d Cir. 2005).

As to the "object of the scheme" element, a defendant need not literally obtain money or property -- in the sense of putting money into his own pocket -- to violate the wire fraud statute.  *See Porcelli v. United States*, 404 F.3d 157, 162-63 (2d Cir. 2005) (finding it was sufficient to convict defendant of wire fraud where the tax scheme involved him *keeping* money he already had by virtue of his not paying taxes); *see also United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006).  And because individuals have the right to control their property, depriving the victim of "economic information it would consider valuable in deciding how to use its assets" satisfies the object-of-the-scheme element.  *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).  Still, as the Supreme Court recently noted, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."  *Kelly v. United States*, 140

S. Ct. 1565, 1573 (2020). Loss to the victim "must play more than some bit part in a scheme: It must be an object of the fraud." *Id.* (internal quotation marks omitted).

## B. *Application*

Defendants argue that they "were convicted of a fraud they did not know about." Appellants' Br. at 42. In other words, they contend that there was no scheme to defraud because Defendants did not know that false representations would be made to the Universities. Defendants also argue that even if there were such a scheme, the government failed to prove that the Universities' athletic-based aid was an object of that scheme. We disagree in both respects.[3]

### 1. *Scheme to Defraud*

Defendants have not shown that the government failed to present enough evidence for "*any* rational trier of fact," *Jackson*, 443 U.S. at 319, to find, beyond a reasonable doubt, that there was a scheme to defraud, *see* 18

---

[3] The government contends that Defendants did not argue in their Rule 29 motion before the district court that they lacked knowledge that any certifications -- much less false certifications -- would be made, and therefore we should review their challenge for plain error. We need not resolve this issue, as Defendants' argument fails even under the less exacting *de novo* standard.

U.S.C. § 1343.  Although Defendants are correct that the government did not provide direct evidence that proved Defendants knew the Recruits had to sign eligibility certifications to earn athletic-based aid, the government did present enough circumstantial evidence for the jury to have reached that conclusion.  *See Guadagna*, 183 F.3d at 129 (noting that circumstantial evidence that "show[s] . . . defendant made misrepresentations to the victim(s) with knowledge that the statements were false" may prove intent); *see also United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2016) ("[C]ourts . . . may not reject a jury verdict simply because it rests even wholly on circumstantial evidence.").

First, Defendants were sophisticated actors who were involved in all aspects of top-tier basketball in America, including the amateur grassroots leagues, college basketball programs, and the NBA.  Gatto was the head of global sports marketing for Adidas, one of the top sports apparel companies in the world, and he was in charge of Adidas's entire basketball marketing budget.  Code worked for Nike, another top apparel company, for fourteen years where he cultivated relationships with grassroots, high school, and college basketball programs before he began consulting for Adidas.  And Dawkins spent time working for a sports agency recruiting NBA prospects.  The jury was therefore

presented with evidence of Defendants' proximity to -- and involvement in -- all things basketball.

Second, Defendants went to great lengths to prevent both Adidas and the Universities from discovering that they were paying the Recruits' families. Defendants worked together to disguise their funneling of tens of thousands of dollars to the Recruits' families to induce the Recruits to enroll at Adidas-sponsored schools. Indeed, Defendants had to lie to Adidas to get reimbursed for these secretive payments, as those in charge of the budget at Adidas knew the payments violated both "NCAA regulation and Adidas policy" and would not have signed off on them had they known the truth. Supp. App'x at 311. Their furtive behavior indicates that they knew their actions were wrong. When coupled with their sophistication, it was reasonable for the jury to infer they knew the Recruits had to deceive the Universities about their eligibility.

Third, Defendants' co-conspirators admitted on wiretaps that their conduct violated NCAA rules. Gassnola, who worked directly under Gatto, explained to the jury that had the Universities learned that Smith's family had been paid, he "would have been deemed ineligible" and "would never have played [at N.C. State]." App'x at 283-84. Sood, another co-conspirator, stated

that he knew that giving money to NCAA athletes was not permitted under NCAA rules and could have led to those players losing their scholarships. Even if the co-conspirators' knowledge could not be imputed to Defendants, it is nevertheless circumstantial evidence the jury was permitted to consider. *See United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993).

Fourth, Code and Dawkins acknowledged that Bowen had to sign an NCAA form for his commitment to Louisville to be complete. And Dawkins was recorded on a wiretap discussing the need to avoid a paper trail "because some of it is whatever you want to call it, illegal, against NCAA rules, or whatever." Supp. App'x at 47. Accordingly, these statements, together with Defendants' sophistication, steps taken to conceal their actions, and co-conspirators' statements, surely show that Defendants knew that the Recruits had to sign eligibility forms to compete in the NCAA, and constituted sufficient evidence for the jury to find that Defendants knew a materially false representation had to be made for the scheme to succeed. *See United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006).

## 2. *Object of Scheme*

Similarly, the jury was also presented with enough evidence for a rational trier of fact to find that the Universities' athletic-based aid was "an object" of their scheme. *See Kelly*, 140 S. Ct. at 1573; *see also* 18 U.S.C. § 1343. In *Kelly*, better known as the "Bridgegate" case, state officials devised a scheme to punish the mayor of Fort Lee, New Jersey, for declining to endorse the incumbent New Jersey governor in his reelection bid. *Kelly*, 140 S. Ct. at 1568. To do so, politically appointed Port Authority officials closed traffic lanes that led from Fort Lee to the George Washington Bridge for four days under the guise that they were conducting a traffic study. *Id.* The study, however, was a sham; no official was interested in the data it produced. *Id.* at 1570. The government charged the officials with property fraud, arguing that they commandeered the traffic lanes and deprived the state of property by paying extra wages to perpetuate the scheme. *Id.* at 1571-72. The officials who did not plead guilty went to trial and were convicted, *id.* at 1571, but the Supreme Court overturned their convictions, *id.* at 1574.

The unanimous *Kelly* Court found that property was not an object of the scheme. *Id.* at 1572. It explained that the traffic study was a "sham," intended

- 19 -

only to cover up the defendants' misconduct and the additional wages were "implementation costs" that only became necessary because an additional toll booth operator was needed after the original plan was altered to avoid traffic accidents. *Id.* at 1574. Because the officials' only goal was political retaliation -- to create a headache for the Fort Lee mayor -- and the officials were indifferent about the unintended additional costs of carrying out the plan, they were not guilty of property fraud. *Id.* The *Kelly* Court held that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id*. at 1573.

This case is different from *Kelly*.[4] Here, the loss of property -- the Universities' funds set aside for financial aid -- was at the heart of Defendants' scheme. Their original plan included inducing the Universities to give the Recruits financial aid by concealing from the Universities the payments made to the Recruits' families in fear that if they were discovered the Recruits would not

---

[4]     In *Kelly*, the Court explained that "a scheme to alter . . . a regulatory choice is not one to appropriate . . . property." 140 S. Ct. at 1572. Because the defendants in *Kelly* made a regulatory decision regarding lane usage, there was no fraudulent obtainment of property, especially because any loss to the victim was only incidental to the object of the scheme. *Id.* at 1573. Here, Defendants did not make any regulatory decisions in transmitting and concealing payments to the Recruits' families. Thus, the Court's holding in *Kelly* that the regulatory decisions were not punishable under a property fraud theory is inapposite to the case at hand.

be permitted to compete. Importantly, the scheme depended on the Universities awarding ineligible student-athletes athletic-based aid; without the aid, the recruits would have gone elsewhere. And if the Recruits' ineligibility had been discovered by the schools, the scheme would have failed. After all, the Recruits would have never been permitted to play in the NCAA for Adidas-sponsored schools, defeating the purpose of the payments and potentially derailing the Recruits' professional careers.[5]

Defendants have asserted that they intended to "assist the Universities' recruiting efforts" by luring the best basketball players to Adidas-sponsored schools to better market their brand. Appellants' Supp. Br. at 6. Defendants may have had multiple objectives, but property need only be "*an object*" of their scheme, *Kelly*, 140 S. Ct. at 1572 (emphasis added), not the sole or primary goal. Unlike in *Kelly*, where there was a sham study and additional wages were paid only after the original plan was scaled back due to safety

---

[5] Indeed, Bowen and Preston never played for Louisville and Kansas, respectively. Moreover, each has struggled to find playing time in the NBA. Bowen has only played 29 minutes for the NBA's Indiana Pacers and has spent most of his professional career playing for the team's minor-league affiliate, the Fort Wayne Mad Ants. Preston has never appeared in an NBA game and has only played for the minor-league affiliates of the NBA's Cleveland Cavaliers, New Orleans Pelicans, and Dallas Mavericks.

concerns, *id.* at 1574, here, depriving Universities of athletic-based aid was at the *center* of the plan.

Finally, the evidence, construed in the government's favor, showed that Defendants deprived the Universities of information that would have helped them decide whether to award the Recruits athletic-based aid. This deprivation was enough to support a wire fraud conviction. *See Finazzo*, 850 F.3d at 111. As discussed above, hiding the Recruits' ineligibility was essential to Defendants' scheme -- had the Universities known the Recruits were ineligible, they would not have offered them athletic-based aid or roster spots on their basketball teams. Similarly, it was reasonable for the jury to find that Defendants knew the Recruits had to misrepresent their eligibility to deceive the Universities into giving them athletic-based aid. Thus, it is evident that Defendants' scheme facilitated the withholding of valuable information that would have caused the Universities not to dispense with their property. *See United States v. Lebedev*, 932 F.3d 40, 48-49 (2d Cir. 2019). Accordingly, we conclude that the jury rationally found that Defendants committed wire fraud.

## II.    *Evidentiary Rulings*

We review a district court's evidentiary rulings for abuse of discretion, *United States v. McDermott*, 245 F.3d 133, 140 (2d Cir. 2001), and such rulings will only be overturned if they are "arbitrary and irrational," *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012). "Even if a decision was manifestly erroneous, we will affirm if the error was harmless." *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (citations and internal quotation marks omitted). An "error is harmless if it is highly probable that it did not contribute to the verdict." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010).

Defendants argue that the district court erroneously excluded expert testimony and other evidence relevant to their defense. We address these issues in turn.

### A.    *Expert Testimony*

The district court's determination whether to admit expert testimony is guided by Fed. R. Evid. 702. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993). Generally, an expert may be permitted to testify if he is qualified, reliable, and helpful. *See* Fed. R. Evid. 702. Of course, courts must also determine whether the proffered evidence is relevant, *see* Fed. R. Evid. 401, 402,

and, if so, whether its probative value is substantially outweighed by the danger of unfair prejudice, Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").  Thus, although an expert may otherwise be qualified to testify, the district court can nevertheless exclude his testimony if it finds the testimony would be unfairly prejudicial.  *United States v. Dukagjini*, 326 F.3d 45, 51-52 (2d Cir. 2003) ("Of course, expert testimony, like other forms of evidence, 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" (quoting Fed. R. Evid. 403)).  Although "a trial judge is given broad discretion to weigh these competing interests," this "does not mean immunity from accountability." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983).  On appeal, we "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.*

Defendants sought to call an expert witness to discuss the myriad of benefits -- both quantitative and qualitative -- that a successful men's basketball program bestows upon a university.  Defendants argue that this testimony

- 24 -

would have proven that they intended to help, not harm, the schools when they paid the Recruits' families to entice the Recruits to attend Adidas-sponsored schools. But the district court did not permit the expert to testify.

First, it found that the expert's testimony would not have been helpful because it was based on a study conducted in preparation for litigation and therefore "would have shed no light on [D]efendants' states of mind at the time the crimes allegedly were committed." S. App'x at 47-48. Second, the district court found, "[i]n any case," S. App'x at 48, that the information the expert would have presented was substantially more prejudicial than probative. It noted that allowing the expert to testify could have invited improper acquittals by enticing the jury to base its decision on the perceived unreasonableness or unfairness of the NCAA's amateurism rules. The district court explained how permitting the expert to testify would have introduced an improper defense -- that Defendants were not guilty of wire fraud because they believed the Universities would ultimately benefit from their actions.

We agree with the lower court's ruling, which was neither arbitrary nor irrational. Even if we assume Defendants' expert's testimony would have been helpful, it was substantially more prejudicial than probative. No doubt,

universities stand to profit if their men's basketball programs are successful. It is even possible, as Defendants' expert would have suggested, that a cost-benefit analysis would reveal that universities come out net-positive when they commit recruiting violations. But this does not help Defendants. The law is clear: a defendant cannot negate the fraud he committed by wishing that everything works out for his victim in the end. *Calderon*, 944 F.3d 72, 90 (2d Cir. 2019) ("[T]he fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.") (quoting *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998)); *see also United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011). That the Universities might have ultimately benefitted monetarily from having top tier recruits would not have changed whether Defendants were guilty of wire fraud, and the evidence might have clouded the issue for the jury. Accordingly, the district court did not abuse its discretion.

**B.** *Other Evidentiary Challenges*

Defendants also challenge several other evidentiary rulings. None of their arguments have merit.

### 1.    *Phone Calls*

Defendants sought to admit the contents of several recorded phone calls.[6]  In one of those calls, Code and Dawkins discussed a high school basketball recruit not involved in this case.  In that conversation, which the district court excluded, the two noted that the recruit's family was asking a school for money in exchange for their son's commitment to play for that school's basketball team.  Code and Dawkins discussed how it was worthwhile for the school to meet those demands because it stood to profit substantially from that player.  Although the district court did not clearly explain its reasoning, there are at least two acceptable reasons for it to have excluded the call.  First, assuming, as Defendants argue, that the information from the call fit within the state of mind hearsay exception, *see* Fed. R. Evid. 803(3), it was not unreasonable for the district court to determine that the call -- which did not concern any of the recruits in this case and involved conduct that occurred *after* the payments alleged in the indictment were made -- was irrelevant.  Second, admitting this phone call could have led the jury down the impermissible road of considering

---

[6]    The recordings and transcripts of certain phone calls were sealed, and the parties filed both sealed and redacted briefs and appendices.  These records are unsealed to the extent, and only to the extent, the phone calls are discussed in this opinion and the separate opinion.

- 27 -

the wisdom of the NCAA's amateurism rules instead of the actions of Defendants. Accordingly, the district court did not abuse its discretion in excluding this call.

Defendants also take issue with the district court's exclusion of other phone calls in which various NCAA coaches purportedly encouraged Defendants to violate the amateurism rules. Defendants contend that this evidence proved they were doing "what the Universities wanted and expected their corporate apparel sponsors to do." Appellants' Br. at 114.[7] They also argue that the calls would have contradicted the testimony of Gassnola, one of the government's cooperating witnesses. The district court, however, found the prejudicial effect of these calls to substantially outweigh their probative value, and it did not admit them. This was not an abuse of discretion.

First, at least one coach on these calls worked at a school not involved in this case, and therefore his discussion of practices elsewhere had little relevance here. Second, to the extent the calls were relevant, allowing such testimony could have confused the jury, as it would have required the jury to

---

[7]    Defendants cite a 2018 report by the Commission on College Basketball, "Report and Recommendations to Address the Issues Facing Collegiate Basketball," which noted that "[e]veryone knows what's been going on." App'x at 1531.

learn about individuals not involved in the case. Third, even if we accept that coaches encouraged NCAA recruiting violations -- there was testimony, for example, that Pitino, Louisville's coach, needed "[p]lausible deniability," App'x at 640 -- that the coaches asked Defendants to pay the Recruits' families was *not* a defense unless, as we discuss further below, the coaches were unconflicted and acting in good faith on behalf of their Universities, *see D'Amato*, 39 F.3d at 1257-58. In addition, a closer examination of the calls Defendants sought to admit further refutes this argument. When the topic of compensating recruits came up, for example, one coach said: "I have got to shut my door." D. Ct. Dkt. No. 259 at 28. That this coach did not want to have a conversation about violating NCAA rules with his door open indicates that his school did not condone such behavior. Another coach said he kept his relationship with Dawkins "off the book," which the jury reasonably could have understood to mean off the record. D. Ct. Dkt. No. 259 at 31. Thus, this evidence is of limited utility to the extent it supposedly proves that Defendants believed they were doing what the Universities here wanted, as it cuts against any argument that the coaches were unconflicted and acting in good faith. *See D'Amato*, 39 F.3d at 1257-58. Accordingly, the district court did not abuse its discretion in excluding the evidence.

We also disagree that admitting the phone calls would have called into question Gassnola's veracity. Gassnola testified that he would not have told a University that he had paid a recruit's family member because "[t]hey wouldn't have liked [that] very much." App'x at 293. Defendants argue that the phone calls in which various coaches solicited this sort of help would have contradicted this testimony. We are not persuaded. The evidence Defendants sought to admit -- phone calls that Gassnola was *not* a part of -- consisted of coaches speaking guardedly about NCAA violations because they knew what they were doing was wrong. It is wholly consistent that Gassnola would have refrained from discussing the payments with University personnel. Flaunting such violations to the Universities, after all, would have put their compliance departments in difficult situations. Thus, we are not persuaded that Defendants' cross-examination of Gassnola was inhibited because the district court excluded the phone calls, and we conclude that the district court did not abuse its discretion in excluding the phone calls.[8]

---

[8]    In his partial dissent, Judge Lynch presents thoughtful and substantial arguments in favor of reaching evidentiary outcomes different from those reached by the district court with respect to certain of the phone calls as well as certain of the recruiting violations discussed in the next section. While his concerns certainly give us pause, we believe that the district court did not abuse its broad discretion in ruling on these difficult and close evidentiary questions.

## 2. *Recruiting Violations*

Defendants also sought to present evidence of Louisville's previous recruiting infractions "to demonstrate that . . . Louisville had a history of violating NCAA rules in order to recruit talented athletes, and thus, [Defendants] had no reason to think they were defrauding Louisville by doing the same." Appellants' Br. at 117. In particular, Defendants wanted the jury to learn that Louisville was sanctioned for providing recruits who visited Louisville with exotic dancers and prostitutes. Importantly, Defendants sought to introduce an NCAA Committee on Infractions ("COI") decision that found, *inter alia*, that Louisville committed recruiting violations by providing impermissible benefits to prospective players. As the district court noted, the COI decision is "somebody's opinion of what the facts were." App'x at 153. Accordingly, the decision itself was not a fact, and it therefore could not be admitted into evidence by a University compliance officer who was not involved in the investigation. The district court also excluded the evidence under Rule 403. Again, this was not an abuse of discretion.

Notably, Defendants stipulated with the government that Louisville previously violated NCAA rules and was sanctioned because of it. This

permitted Defendants to argue -- as two of them did in summation -- that they did not think they were defrauding the Universities by committing recruiting violations because Louisville itself had previously disregarded NCAA rules. Indeed, this is why they sought to admit the violations in the first place. That the district court did not allow the intricate details of high school recruits being provided escorts and prostitutes to distract the jury from the scheme at issue in the case was not an abuse of discretion.

### 3. *Compliance Witnesses*

Defendants also sought to admit evidence to challenge the Universities' compliance officers' collective testimony that they were diligent stewards of NCAA rules. In essence, Defendants wanted to demonstrate that the Universities took "calculated risk[s]" when they awarded athletic-based aid to ineligible recruits. Appellants' Br. at 122. To a large extent, Defendants reassert the same reason for why their expert should have been allowed to testify. Because we have already rejected this argument above, we write only to address whether the district court abused its discretion in refusing to allow cross-examination about certain NCAA guidelines. We conclude it did not.

On cross-examination, Defendants were not permitted to question the compliance officers about specific instances in which student-athletes who competed for the Universities were temporarily deemed ineligible and then readmitted to play under the NCAA reinstatement guidelines. According to Defendants, ineligible student-athletes who did not know that their families accepted improper benefits may be reinstated to their teams after serving suspensions. Because these penalties are temporary and unencumbering, as the argument goes, the Universities were willing to risk getting caught because the reward outweighed the risk. The district court found that the evidence was beyond the scope of direct examination, not relevant, and substantially more prejudicial than probative. We agree.

A trial court "is accorded broad discretion in controlling the scope and extent of cross-examination." *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2013) (internal quotation marks omitted). We recognize that it is "unrealistic to expect that direct examination and cross-examination will be perfectly congruent," and we have noted that "[t]he latter need only be reasonably related to the former." *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010).

Here, on direct examination, the government discussed the NCAA reinstatement guidelines in reference to the sanctions a university could face. It did not discuss how a student-athlete who has been deemed ineligible goes about getting reinstated or the penalties such student-athlete might face. It was not an abuse of the district court's broad discretion to prevent Defendants from asking questions about specific instances in which student-athletes not involved in this case were deemed ineligible and eventually reinstated. Moreover, this line of questioning would have confused the jury and distracted it from the issue in the case: whether Defendants withheld valuable information from the Universities to defraud them of athletic-based aid. Indeed, Defendants' entire argument that the Universities took calculated risks by signing ineligible student-athletes because the penalty for doing so was meager is not responsive to the prosecution's theory that Defendants *concealed* the Recruits' ineligibility from the Universities. Thus, to the extent that Universities weighed the consequences of issuing athletic-based aid to ineligible recruits, Defendants prevented them from doing so here by misrepresenting that Bowen, Preston, and Smith were in compliance with NCAA rules.[9]

---

[9] Defendants' remaining argument that they were improperly barred from introducing a portion of the NCAA rulebook is without merit. Even assuming the district court erred by not

## III.    *Jury Instructions*

"We review *de novo* a district court's jury instruction," *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015), "and will vacate a conviction for an erroneous charge unless the error was harmless," *United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013).  If, however, "a defendant fails to make a timely objection, we review the instruction for plain error."  *Id*.  A jury charge is adequate if "taken as a whole, [it] is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016); *see also United States v. Dyer*, 922 F.2d 105, 107 (2d Cir. 1990) ("[A] jury charge must be viewed as a whole and in the context of the entire trial.").  "A jury instruction is erroneous if it either fails adequately to inform the jury of the law or misleads the jury as to the correct legal standard."  *United States v. George*, 779 F.3d 113, 117 (2d Cir. 2015).

Defendants argue that the district court erroneously instructed the jury on: (1) conscious avoidance; (2) the meaning of "obtain" in 18 U.S.C. § 1343; (3) the "right to control"; and (4) the requisite intent.  We address these issues in turn.

---

admitting the evidence during cross-examination, any such error was harmless, as Defendants' argument relied on a flawed, selective reading of the rulebook.

**A.**     *Conscious Avoidance*

The doctrine of conscious avoidance (*i.e.*, "willful blindness") prevents defendants from avoiding criminal liability by "deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances" and that, if known, would render them guilty of a crime. *Glob.- Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). This doctrine has two requirements: "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 769.

A conscious avoidance jury charge "permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact." *United States v. Kozeny*, 667 F.3d 122, 132 (2d Cir. 2011). Such a charge may be given when (1) the defendant claims to lack "some specific aspect of knowledge required for conviction" and (2) there is enough evidence for "a rational juror [to] reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Fofanah*, 765 F.3d 141, 144-45 (2d Cir. 2014). The instruction "permits a finding of

knowledge even where there is no evidence that the defendant possessed actual knowledge." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000). When a defendant challenges the factual basis for a jury's finding of conscious avoidance, he is essentially challenging the sufficiency of the evidence and therefore "bears a heavy burden." *See United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003).

In pertinent part, the district court here explained that the jury "may find that a defendant acted with the necessary knowledge as to particular facts on the basis that the defendant consciously avoided learning those facts by deliberately closing his eyes to what otherwise would have been clear." App'x at 450. The court was clear that because Defendants denied that they knew the Recruits had to sign eligibility certifications, the jury could find that it was Defendants' "consci[ous] intention" -- as compared to their "carelessness or negligence" -- to remain ignorant of facts to "escape the consequences of criminal law." App'x at 451. Importantly, the court noted that a conscious avoidance argument "is not a substitute for proof. It is simply another fact you may consider in deciding what the defendant knew." App'x at 451.

Defendants raise several arguments for why the conscious avoidance jury instruction was erroneous. None is persuasive. First, Defendants

argue that that the government failed to show that Defendants deliberately avoided confirming the facts, and therefore the conscious avoidance charge should not have been given. While it is true that conscious avoidance requires more than a reckless or negligent disregard of the facts, *see Glob.-Tech Appliances*, 563 U.S. at 769-70, the government met its burden here. As discussed in detail above, the jury heard ample evidence demonstrating that Defendants knew the Recruits had to misrepresent their eligibility for the scheme to succeed. Moreover, the district court's charge accurately instructed the jury on the law, and the jury reasonably concluded Defendants consciously avoided learning of the eligibility forms.

Next, Defendants contend that it was impossible for them to have consciously avoided learning that the Recruits had to sign eligibility forms for the scheme to succeed because the forms were completed after the payments were made. This argument is unavailing. We have previously rejected the proposition that "a conscious avoidance instruction is only appropriate where the crime includes knowledge of *an existing* fact as an element." *United States v. Gurary*, 860 F.2d 521, 526 (2d Cir. 1988) (emphasis added). Rather, such a charge is appropriate when there is "proof of notice of high probability" that future

conduct will occur. *Id.* at 527. Although the charge may be inappropriate in certain one-off crimes where at best the jury is left to speculate what the defendant may have foreseen happening, *but see Ferguson*, 676 F.3d at 279 (conscious avoidance charge was permissible where "parameters of the deal were developed over a number of months, and there were numerous forward-looking meetings, emails, and negotiations"), it is a permissible charge when defendants' repeated conduct makes it all-the-more likely that they remained willfully blind. *Gurary*, 860 F.2d at 527. Here, Defendants were involved in at least three schemes that spanned several years.[10] Accordingly, the charge was appropriate.

Third, Defendants argue that the district court gave two inconsistent charges, asking the jury to find that Defendants consciously avoided a fact while also willfully causing a result. There is no inconsistency here. Willful causation is a form of secondary liability where an actor can be found guilty of a crime if he purposefully caused another to act criminally. *See United States v. Nolan*, 136 F.3d 265, 272 (2d Cir. 1998); 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against

---

[10] The indictment also mentioned a similar scheme at the University of Miami, and there was evidence presented at trial that indicated at least one other recruit's legal guardian was paid for that recruit to commit to Kansas.

the United States, is punishable as a principal.").  The district court's instruction as to conscious avoidance permitted the jury to impute *knowledge* onto Defendants.  The willful causation charge, conversely, permitted the jury to impute a third party's *actions* onto Defendants.  Here, it allowed the jury to attribute the Recruits' false statements to Defendants, who both persuaded the Recruits to sign on with the Universities and rendered them ineligible by violating NCAA rules.  These two charges are compatible.  In any event, even assuming the district court committed error, any such error was harmless, as the jury could have found that Defendants had actual knowledge that false representations would be made to the Universities.  *See Ferrarini*, 219 F.3d at 154 ("[A]n erroneously given conscious avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was overwhelming evidence to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue." (internal quotation marks omitted)).

**B.** *"Obtain"*

A defendant is guilty of wire fraud if he "devises or intends to devise any scheme or artifice to defraud, or for *obtaining* money or property by means of false or fraudulent pretenses, representations, or promises" and uses

wires to further that scheme. 18 U.S.C. § 1343 (emphasis added). Defendants

argue that a plain reading of the statute makes it clear that the law requires that

property or money be obtained *by* the defendant *from* the victim, and the district

court erred by not making this clear to the jury. We are not persuaded.

The district court instructed the jury, in relevant part, that

Defendants had to have made or caused another to make a false statement that

involved a "material fact . . . that would reasonably be expected to influence, or

that is capable of influencing, the decision of the [Universities to award the

Recruits athletic-based aid]." App'x at 441. It made clear that Defendants did not

need to profit from the fraud; they did, however, need to "contemplate[]

depriving the victim . . . of money or property," App'x at 443. Indeed, the court

was explicit: "[A] victim can be deprived of money or property . . . when it is

deprived of the ability to make an informed economic decision about what to do

with its money or property." App'x at 444. This instruction, as noted above,

accurately explains the law. *See United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007)

("Since a defining feature of most property is the right to control the asset in

question, we have recognized that the property interests protected by the [wire

fraud] statute[] include the interest of a victim in controlling his or her own assets.").

First, Defendants rely on two canons of statutory interpretation -- that courts are bound by what the text of a statute says and that courts must apply the ordinary meaning of the words in a statute. They contend that the words "obtaining" and "defraud" in § 1343 unambiguously mean that a defendant must personally obtain property from the victim to be convicted of wire fraud. This interpretation conflicts with our Court's precedent. As noted above, we have held that the wire fraud statute is violated when the defendant prevents the victim from making an informed economic decision about the victim's property, regardless of who ultimately benefits from the victim's property. *See Finazzo*, 850 F.3d at 111 (approving a jury instruction that explained that "the right to control one's assets is injured when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets") (internal quotation marks omitted); *see also Binday*, 804 F.3d at 581 (approving a jury instruction that explained that "a person can also be deprived of money or property when he is deprived of the ability to make an informed economic decision about what to do with his money

or property").  Indeed, a defendant "does not need to literally obtain money or property to violate the [wire or mail fraud] statute[s]."  *Porcelli*, 404 F.3d at 162 (internal quotation marks omitted); *see also Males*, 459 F.3d at 158 (same).

Further, Section 1343 punishes the individual who devises the scheme.  18 U.S.C. § 1343 ("*Whoever, having devised or intending to devise any scheme or artifice to defraud*, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . " is guilty of wire fraud. (emphasis added)).  What matters, therefore, is that there was a scheme to defraud a victim of money or property.  By the plain language of the statute, the identity of the ultimate beneficiary is not dispositive and the plain meaning of the word "obtain" is sufficiently capacious to encompass schemes by defendants to obtain money for the benefit of a favored third party.  *See United States v. Johnson*, 945 F.3d 606, 610-11 (2d Cir. 2019) (affirming a bank executive's wire fraud conviction when his misrepresentations caused the victim to confer a benefit on the bank rather than himself).  Thus, a victim's loss need not flow directly *to* the defendant for the defendant to be guilty of wire fraud.  *See United States v. Calderon*, 944 F.3d at 88-90 (holding that a wire fraud scheme contemplated actual harm to the victims when modifications to bills of lading

- 43 -

exposed banks "to risk of default or non-reimbursement" from foreign correspondent banks and increased the risk the government would not reimburse the victim banks if a foreign bank defaulted).

Second, Defendants rely on case law. They contend that Supreme Court precedent and several out-of-circuit cases also require that the defendant personally obtain the victim's property. Not so. Although, as discussed above, obtaining the victim's property must be "an object of the fraud," *Kelly*, 140 S. Ct. at 1573, there is no precedent mandating that the victim's property flow directly to the defendant. Nor should there be. Surely a defendant would be guilty of fraud if he deceived a victim into providing money or property to the defendant's relative, friend, or favorite charity, rather than directly to the defendant himself. Such an act would come within the plain meaning of the statute: the deception would be for the purpose of obtaining money or property from the victim for a person of defendant's choosing.

Defendants also misread *Carpenter v. United States*, 484 U.S. 19 (1987), claiming that it stands for the proposition that a defendant must obtain property from the victim. The language Defendants quote, however, is the Court reiterating an argument made by one of the parties -- it is *not* the Court's holding.

*Compare* Appellants' Br. at 63 ("[A]fter *McNally*, the requirement that the defendant 'obtain . . . money or property from the [victim]' is a 'necessary element' of wire fraud."); *with Carpenter*, 484 U.S. at 25 ("Petitioners assert that . . . they did not obtain any 'money or property' from the [victim], which is a necessary element of the crime under our decision last Term in [*McNally*]."). Indeed, the Court in *Carpenter* explains that the property fraud statutes "reach *any* scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter*, 484 U.S. at 27 (emphasis added). Once again, there is no requirement that the property flow to the defendant.

Nor are we bound or persuaded by the out-of-circuit precedent that Defendants cite. We address only the case on which Defendants most heavily rely. In *United States v. Walters*, the Seventh Circuit explained that "[l]osses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement" for property fraud. 997 F.2d 1219, 1227 (7th Cir. 1993). We do not quarrel with this rule, which was recently reaffirmed by the Supreme Court. *See Kelly*, 140 S. Ct. at 1573. The facts of *Walters*, however, are distinguishable.

- 45 -

Norby Walters was an aspiring sports agent who gave NCAA student-athletes cars and money with the hope that they would retain him as their agent when they turned professional. *Walters*, 997 F.2d at 1221. This, of course, violated the NCAA's amateurism rules. *Id.* The Seventh Circuit noted that because "[t]he athletes' pro prospects depended on successful completion of their collegiate careers," *id.*, it could "assume that Walters knew that the universities would ask [the] athletes to verify that they were eligible to compete as amateurs," *id.* at 1222, and Walters "promised to lie to the universities" about the payments if asked, *id.* at 1221.

The *Walters* Court acknowledged that the case was close: "Everything . . . turns on matters of degree. Did the schemers foresee that the mails would be used? Did the mailing advance the success of the scheme? Which parts of a scheme are 'essential'? Such questions lack obviously right answers." *Id.* at 1222. Ultimately, the Court found that Walters did not "conceive[] a scheme in which mailings played a role." *Id.* In other words, Walters did not satisfy a critical element of the mail fraud statute: he did not intend to mail anything. *Id.* ("For all Walters cared, the [eligibility] forms could sit forever in cartons. Movement to someplace else was irrelevant."). Here, the

equivalent element in the wire fraud statute is the use of wires, which Defendants do not -- and cannot -- dispute. Accordingly, Defendants' reliance on *Walters* is misplaced, and, for the reasons noted above, the district court did not err in its instructions on the meaning of "obtain."

### C. *Right to Control*

Because one has a right to control one's property, "a wire fraud charge under a right-to-control theory can be predicated on a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information." *Lebedev*, 932 F.3d at 48 (internal quotation marks and alterations omitted); *see also Finazzo*, 850 F.3d at 111 ("[M]isrepresentations or non–disclosure of information cannot support a [wire fraud] conviction under the 'right to control' theory unless those misrepresentations or non–disclosures can or do result in tangible economic harm."). In other words, as discussed above, depriving a victim of "potentially valuable economic information it would consider valuable in deciding how to use its assets" prevents the victim from exercising its right to control its property and can therefore support a wire fraud conviction. *Finazzo*, 850 F.3d at 111.

Defendants' "right to control" argument is essentially a refashioning

of its "obtain" arguments, which we have addressed above. Here, Defendants

argue that "the Universities' ability to make an informed economic decision

about scholarships is not property, because it is not an interest that holds any

independent economic value." Appellants' Br. at 71 (internal quotation marks

omitted). Accordingly, they contend that the district court erred when it

instructed the jury on the right-to-control theory.[11] They challenge the following

portion of the district court's instruction:

> [A] victim can be deprived of money or property also
> when it is deprived of the ability to make an informed
> economic decision about what to do with its money or
> property -- in other words, when it is deprived of the
> right to control the use of its assets. I instruct you that a
> victim's loss of the right to control the use of its assets
> constitutes deprivation of money or property if, and
> only if, the scheme could have caused or did cause
> tangible economic harm to the victim.

App'x at 444.

There is no doubt that the Universities' scholarship money is a

property interest with independent economic value. First, and most obviously,

---

[11] Defendants objected to the "right to control" jury instruction given by the district court in a pre-trial filing, but they did not renew this objection at the charge conference. We need not determine whether this affects the standard of review, as Defendants' argument fails either way.

the Universities awarded tuition, room, and board to the Recruits. Without these awards, the Recruits would have had to pay tens of thousands of dollars to attend the schools. Second, there are a finite number of athletic-based scholarships that each University can award. Thus, giving a scholarship to one student necessarily precludes another student from receiving that same scholarship. And because the Universities would not have awarded the Recruits this aid had they known the Recruits were ineligible to compete, withholding that information is a quintessential example of depriving a victim of its right to control its assets. Accordingly, the district court's instructions accurately reflected the law, and it therefore did not err in this respect. *See Finazzo*, 850 F.3d at 111.

### D. *Intent*

As discussed above, a defendant must act with fraudulent intent to be convicted of wire fraud. Thus, if the victim -- or an agent authorized to act on behalf of the victim -- gives permission to the defendant to act in the manner at issue, the defendant cannot be found guilty of wire fraud. *See United States v. Bonanno*, 430 F.2d 1060, 1064, 1064 n.5 (2d Cir. 1970) (noting that use of others' credit cards "*without permission*" constituted evidence of "intent to mislead" in a

- 49 -

mail fraud conviction) (emphasis added). An agent can either have actual authority to act, which is when the agent receives "explicit permission from the principal to act on its behalf," *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012), or apparent authority to act, which is when an agent has the ability to bind the principal to transactions with third parties because representations that the principal made to the third party make it reasonable for the third party to believe the agent has such an ability, *United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993). "It is the law in this circuit, as well as generally, that customarily only the representation *of the principal to the third party* can create apparent authority, not the representation of the agent alone." *Id.* (emphasis added).

Certain corporate agents, however, inherently have apparent authority to represent their principals, even if the principal does not make a specific representation to the third party. *See D'Amato*, 39 F.3d at 1258. For there to be apparent authority in such a circumstance, two elements must be met: (1) the principal is making a lawful decision to conceal the relationship with the agent and (2) the agent is acting in good faith and not profiting from the decision. *Id.*

Defendants argue that they did not have the requisite fraudulent intent because their scheme was designed to *help* the Universities recruit top-tier players. Indeed, they argue that the men's basketball coaches asked them to make payments to the Recruits' families. Accordingly, Defendants take issue with the district court's jury instruction on intent, which they contend should have made clear that the jury could acquit if it found that Defendants believed the men's basketball coaches had the apparent authority to instruct them to violate NCAA rules. Contrary to Defendants' arguments, the district court did just that.

As an introduction to the concept of agency law, the district court instructed the jury as follows:

> Each of the alleged victims and intended victims of the crimes charged in the indictment is a university. Universities, of course, are not human beings. They can think or act only through their agents -- that is to say, their officers, their employees, and their other authorized representatives. So, the knowledge, the intentions, the statements, and the actions of a university officer, employee, or other representative -- and that includes basketball coaches -- are considered to be those of the university to the extent, but only to the extent, that the officer, employee, or other representative is, first of all, acting within the scope of the authority of that officer, agent, or representative and, second of all, without any purpose to profit

> personally or otherwise benefit him or herself in a
> manner that is not fully aligned with the interests of the
> university.

App'x at 438-39.

Defendants characterize this as an actual authority jury instruction. We disagree. As the district court noted, the words "actual authority" do not appear anywhere in this instruction. While this alone is not dispositive, the context in which the instruction was given is. *See Garnett*, 838 F.3d at 280 (A jury charge is adequate if "taken as a whole, [it] is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it"). Here, the district court was introducing the concept of agency law to the jury. Its instruction accurately explained how the Universities had to act through their agents, which it made clear included the men's basketball coaches. This was a crucial explanation that set up the court's apparent authority instruction, which it gave shortly thereafter. In relevant part, the district court instructed the jury as follows:

> Now, as to certain of the universities, one or more of the
> defendants contends that they lacked intent to defraud
> because they acted in good faith at the request of one or
> more university basketball coaches. An individual who
> does not work for a university and who engages in
> (otherwise legal) conduct to mislead the university lacks

an intent to defraud the university if three things are true: First, he or she was acting at the request of an agent of the alleged victim university; second, the agent had apparent authority to make that request; and, third, the agent appeared to be unconflicted and acting in good faith for the benefit of the victim university and not to serve his or her own interests in a manner that was not fully aligned with the interests of the university.

App'x at 447. The district court went on to explain each of the three prongs in detail.

Defendants contend that the district court's instruction was unnecessarily complex and legally incorrect. Again, we disagree. The thrust of Defendants' argument is that the district court misapplied *D'Amato*, a case where a lawyer (D'Amato) was hired by a vice president of a corporation to lobby D'Amato's brother, a United States senator. *D'Amato*, 39 F.3d at 1252-53. But the district court's jury instructions accurately explained the apparent authority rule from *D'Amato*. From a legal standpoint, this alone ends the inquiry, as the jury instruction neither "fail[ed to] adequately . . . inform the jury of the law [n]or misle[d] the jury as to the correct legal standard." *George*, 779 F.3d at 117. Defendants' argument that they were merely following coaches' instructions when they paid the Recruits' families also misunderstands *D'Amato*. Even

assuming that the Universities' coaches encouraged Defendants to pay Recruits' families to steer the Recruits toward their basketball programs -- indeed, Defendants discussed giving Pitino "[p]lausible deniability," App'x at 640 -- Defendants would have had to have believed that the coaches were acting in good faith.  In other words, if we analogize the head coaches to corporate agents, *D'Amato* teaches that Defendants would have had to believe that the coaches' commands were made in good faith to carry out the principals' (*i.e.,* the Universities') objectives.  *See D'Amato*, 39 F.3d at 1258 (explaining that a party may "follow[] the instructions of an appropriate corporate agent who appears to be unconflicted and acting in good faith").  On this record, the jury could have reasonably found that this was not the case.

The jury was shown the head coaches' contracts, which required them to ensure their players were eligible to compete and provided incentives if their teams had successful seasons.  Defendants were sophisticated actors in the world of college sports, as discussed in detail above, who surely were generally aware of the coaches' obligations to comply with NCAA rules and likely knew there were financial incentives tied to their teams' successes.  Thus, any

argument that Defendants believed the coaches were acting in good faith by violating their contracts to secure top talent is unreasonable.

Moreover, there is no indication that the Universities condoned surreptitiously paying Recruits' families to entice Recruits to play for their basketball teams. *Int'l Bhd. of Teamsters*, 986 F.2d at 20 ("It is the law in this circuit, as well as generally, that customarily only the representation *of the principal to the third party* can create apparent authority, not the representation of the agent alone." (emphasis added)). Instead, there is evidence to the contrary -- compliance officers from the Universities testified about the harsh NCAA sanctions their institutions would face if such activity occurred and was discovered. In any event, there is also no indication that the coaches ever instructed Defendants to conceal the payments. In *D'Amato*, the corporate agent was forthright about the need to create false reports and funnel the payments through D'Amato's law partner. 39 F.3d at 1254-55. This -- along with the fact that payments were repeatedly approved by others who worked at the corporation, *id.* at 1253-54, 1261 -- made it plausible that D'Amato believed this was business-as-usual and approved by the corporation. Here, by contrast, Defendants themselves took these precautions, which shows that they knew

what they were doing was against the Universities' wishes. As Dawkins stated

in a recorded phone call, "I would never tell Rick anything like this because I

don't want to put him in jeopardy." Supp. App'x at 142. These actions belie the

notion that the activity was approved by the Universities.

Because the district court's jury instruction accurately reflected the

law on apparent authority, it did not err.[12]

*CONCLUSION*

At trial, Defendants argued that their intent was not to harm but to

help the Universities, and they also sought to offer evidence that they were not

the only individuals who have paid high school basketball recruits to attend

certain universities. The ends, however, do not justify the means,[13] and that

others are engaging in improper behavior does not make it lawful. *See Gonnella*

---

[12] We are also unpersuaded by Defendants' dual intent argument, as it is commonplace for individuals to have more than one motive for acting. *See United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) ("It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose."). That the district court's jury instruction reflected this notion in no way foreclosed Defendants' good-faith defense. Such an argument ignores the jury instruction as a whole, which explained that "good faith on the part of a defendant that you are considering is a complete defense to the charge of wire fraud." App'x at 446.

[13] Long ago, Judge Medina referred to "the false but seductive doctrine that the end justifies the means," adding that the doctrine "has never taken lodgment in American jurisprudence; and I hope it never will." *United States v. Morgan*, 118 F. Supp. 621, 634 (S.D.N.Y. 1953).

*v. S.E.C.*, 954 F.3d 536, 549 (2d Cir. 2020) ("[T]he fact that behavior is common does not mean it is not fraud."); *see also Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (en banc) ("Even a universal industry practice may still be fraudulent.").

Defendants concede that they broke the NCAA rules, but contend that they did not act criminally. But "the essence of fraud is misrepresentation, made with the intent to induce another person to take action 'without the relevant facts necessary to make an informed . . . decision.'" *United States v, Rutigliano*, 887 F.3d 98, 109 (2d Cir. 2018) (quoting *United States v. Binday*, 804 F.3d at 579). Fraud involves "a departure from fundamental honesty, moral uprightness, or fair play," *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)), and depriving one of property through "dishonest methods or schemes" or "trick, deceit, chicane or overreaching," *Id.* (internal quotation marks omitted). Here, as the jury could have reasonably found, Defendants deprived the Universities of property -- athletic-based aid that they could have awarded to students who were eligible to play -- by breaking NCAA rules and depriving the Universities of relevant information through fundamentally dishonest means.

For the foregoing reasons, the judgments of the district court are

**AFFIRMED**.

GERARD E. LYNCH, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the Court that the evidence was sufficient to support the jury's verdict and that the jury was properly instructed as to the governing law. I believe, however, that the case is much closer as to certain of the district court's evidentiary rulings than the majority allows, and that some of the evidence offered by the defense should have been admitted. Ultimately, I conclude that the erroneous exclusion of that evidence was not harmless. I therefore join in the thoughtful and thorough opinion for the Court, except with respect to Parts II.B.1 and II.B.2 of the Discussion section. For the reasons discussed below, I agree that the convictions of Gatto and Code as to counts one and two should be affirmed. But given the potential effect that the erroneously excluded evidence may have had on the verdict as to certain counts, Gatto's conviction as to count three and Dawkins's convictions on counts one and two should be reversed.

I.    **Overview**

The district court in this case had to walk a fine line with respect to its evidentiary rulings. The defendants' activities occurred in the context of the controversial world of big-time college athletics. Many reasonable people believe that the institution of major college sports has far outgrown its founding assumptions, which postulate that college sports are pursued as an avocation by

student-athletes who compete for the love of the game and the honor of their schools. Today, college athletics is a billion-dollar industry, which generates enormous revenues for universities – and enormous salaries for college coaches, who in the case of public universities are often the highest-paid public employees in their states. Those revenues and salaries are made profitable by the fact that the students who play for the teams receive no compensation (beyond free tuition for classes they often have little time to complete) for working what many – including some of the players themselves and some demanding coaches – view as full-time jobs as athletic performers. The disconnect between the athletes' financial value to their schools and the refusal to pay them what their market value would command if they were acknowledged as full-time professional athletes creates an opportunity for corruption and covert rule-breaking. It is against this backdrop that the district court had to make its careful evidentiary decisions balancing the probative value of various proffered pieces of evidence against the potential of that evidence to prejudice the jury by playing to the likelihood that at least some jurors might believe that the colleges that the defendants were accused of defrauding were themselves corrupt and unworthy of protection.

The defendants in this case were accused of defrauding three universities, by paying cash bounties to the families of outstanding high school basketball players to secure their enrollment at those universities, in violation of the universities' proclaimed policies, so that the universities awarded the athletes valuable scholarships to which they were not entitled under those policies and NCAA rules. The bounties were paid from the funds of a prominent manufacturer of athletic gear and attire, a sponsor of the universities' athletic programs, in violation of the proclaimed policies of that company. The sponsorship gave the company a stake in the competitive success of the sponsored programs, which would enhance the visibility and allure of the company's products, and helped secure the good will of the athletes, in the event they became successful professional basketball players and were offered endorsement deals by the company and its competitors. The sums involved were substantial in relation to the resources of the recruits and their families, but modest in comparison to the sums earned by professional athletes for their endorsements.

The defendants, as the majority notes, acknowledged that their actions violated NCAA rules and the official policies of the universities, that the bounties

rendered the athletes ineligible to compete for the universities, and that the payments were concealed from the highest officials of the universities and the university compliance officers whose job it was to police the rules and policies in question. Their principal defense, however, was that they had no intent to deceive or defraud, because they genuinely believed the cynical proposition that the universities engaged in massive hypocrisy, and were in fact happy for the defendants to make their secret payments, as long as the universities were allowed to *pretend* that they were being deceived. In other words, defendants maintained that they believed that the universities wanted to obtain the best available athletes for their teams (which made more money for the universities the more successful they were on the basketball court) by any means necessary, so long as the universities could claim "[p]lausible deniability." App'x at 640. The defendants offered evidence that they maintain would have supported their asserted lack of intent to deceive the universities, but some of that evidence was excluded by the district court. A principal prong of their appeal relates to those evidentiary rulings.

As the majority acknowledges, to secure a conviction the government was required to prove beyond a reasonable doubt that the defendants intended to

4

deceive the universities. The defendants were permitted to argue that they believed that the universities knew, in general terms, what the defendants were doing, precisely because that belief, if they genuinely held it, would defeat an intent to deceive. But what sort of evidence could help the defendants persuade the jury to entertain a reasonable doubt about whether the defendants genuinely believed what they claimed they believed? If, for example, the president of one of the universities had called the defendants in to his or her office, and told them that the university welcomed their efforts to secure the best basketball players for its team, by bribing the athletes if necessary, but that the defendants had to keep those payments secret, surely that would support the conclusion that the universities were not defrauded; if defendants claimed that they had been told by their superiors at the company that the university president had conveyed that message to the head of the company, such statements (whether or not true) would also support the conclusion that the defendants genuinely believed that the university was not being deceived, regardless of whether the university's compliance officers were in on the secret.

But under the defendants' theory of how the world works, such conversations would be extremely unlikely to occur, and indeed, the defendants

5

did not claim that any such conversations had taken place. The hypocritical façade the defendants claim they believed existed would not permit any but the most oblique signals of approval, for any explicit authorization of the payments risked blowing the cover of the whole industry. So the defendants were reduced to offering what they contended was circumstantial evidence to support their claimed belief. That evidence took various forms, but two principal examples consisted of conversations, recorded without their knowledge, between two of the defendants themselves or between individual defendants and athletic coaches at the victim universities and other institutions, which they argue explained and justified their cynical conclusions. In effect, they wanted to argue that anyone who operated in their milieu would have been led to believe exactly what they purportedly believed.

The problem for the district court is that this kind of evidence could be taken by a jury in several ways. On the one hand, such evidence arguably supported the conclusion it was offered to prove: that a reasonable person in the defendants' position would have believed that the universities did not care what they did, so long as the result was a winning team and so long as any under-the-table payments were kept secret. But on the other, a jury could also take such

6

evidence as indicating two further possible conclusions, which might inure to the defendants' benefit, but which were distinctly *not* legal defenses.

First, the defendants' argument is easily confused with a different argument, that was also part of the defendants' professed belief system: that their activities did not really hurt the universities, or even expose them to significant risk, but instead offered the universities only great financial benefits. Much of the evidence offered by the defendants suggested that, if the universities cared only about the financial bottom line of their athletic programs, they should not mind occasional (or even frequent) violations of the NCAA rules. The proffered evidence suggested that such breaches were common, were infrequently detected, and when detected resulted in penalties that were insignificant in comparison to the financial benefits of maintaining successful teams. But that argument does not support a valid defense. It is not a defense to fraud, for example, that the fraudster lies to investors to get them to buy a stock that the fraudster genuinely believes will "work out well in the end" for the investors, but that they would not buy if told the truth; such a belief does not justify selling stock by means of material misrepresentations. *See, e.g., United States v. Calderon*, 944 F.3d 72, 90-91 (2d Cir. 2019). Thus, given the absence of any direct evidence

7

that the universities knew of and approved the payments, evidence that the system did not provide adequate incentives for rule compliance more directly supported the proposition that someone in defendants' position could have genuinely believed that he was acting in the university's financial interest – a non-defense that might have confused the jurors.

Second, evidence of this sort might persuade a reasonable juror, already skeptical of the universities' professed belief in amateurism, to conclude that the NCAA and the universities were corrupt, exploitative institutions who deserved whatever happened to them, and that the defendants, by helping the athletes' families secure some small portion of the compensation they were fairly due for their valuable labor and for the risks to their health and future careers that they were taking by playing sports, were the good guys. Such a "Robin Hood" defense – that the defendants were essentially robbing the rich to help the poor – is of course also not a legal defense.

How much and what kinds of evidence should be allowed into the trial, and how to balance the probative and prejudicial aspects of particular pieces of evidence, is a delicate task that is confided to the sound discretion of the district court. *See United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012) ("We review

evidentiary rulings . . . for abuse of discretion."). Like the majority, I am loath to second-guess the judgments of the experienced district judge, who was much closer to the lengthy and complex course of this prosecution than are we appellate judges, on these delicate questions. For the most part, I reach similar conclusions to those presented by the majority, finding the decisions of the district court to be reasonable resolutions of the difficult balancing required. Moreover, where I might think that particular rulings were erroneous, even taking account of the deferential standard of review, there are further questions about whether, in light of the full record of the case, any such errors require a new trial, or were merely harmless. Trials are rarely perfect, and individual pieces of evidence are not usually so compelling that their presence or absence is potentially dispositive of the case.

Finally, before turning to the individual rulings contested by the appellants, let me suggest a framework for thinking about these close questions. The issue in this case, as the majority opinion clearly and correctly notes, is not whether we like or despise the system created by the NCAA rules, nor whether we think that system is rife with the potential for, or with widespread examples of, cheating of all kinds. It is whether these defendants deceived these particular

victims about the particular athletes to whose families the payments at issue in this case were made. To my mind, then, the closer the evidence comes to supporting the view that the defendants believed that the specific payments proven in this case were secretly condoned by the particular university involved, the more likely that the probative force of the evidence outweighed the potential prejudice identified above. In contrast, the closer the evidence comes to being generalized evidence that "everybody does it," or that the system itself is corrupt or exploitative in some larger sense, the more likely it is that the prejudice of suggesting that the jury should reject the entire enterprise will outweigh the more tangential value it might have in supporting defendants' professed belief that they were not really deceiving the people from whom they were, concededly, hiding what they were doing.

Though I agree with the majority that we should affirm many of the district court's evidentiary rulings because the prejudicial effect of suggesting non-defense defenses is too great, I write about some of them to point out that the evidence is *not* irrelevant. It has probative value – but the district court made a reasonable decision to keep it out on grounds that its prejudicial effect outweighed its probative value. As to other rulings, however, the district court's

10

decision to exclude relevant evidence due to its prejudicial effect was *not*

reasonable. Ultimately, I conclude that the erroneous rulings were not harmless,

at least as to certain defendants and certain counts.

## II.     Evidence Properly Excluded

### A.     *The Expert Report*

The defendants' expert report is an example of a generalized piece of

evidence that the district court was well within its discretion to find substantially

more prejudicial than probative, because it tends to signal that universities

benefit from this sort of fraud and provides limited probative value as to the

defendants' intent to deceive. The majority assumes that the report would have

been helpful to the defense before holding that the district court did not abuse its

discretion in ruling that the report was substantially more prejudicial than

probative. When reviewing the district court, we "must look at the evidence in a

light most favorable to its proponent, maximizing its probative value and

minimizing its prejudicial effect." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir.

1983), quoting *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979). An

evidentiary ruling should not be overturned unless it was "arbitrary and

irrational." *White,* 692 F.3d 235, 244 (2d Cir. 2012) (internal quotation marks

11

omitted). Under that standard of review, I too would affirm the district court's exclusion of the report.

The report provided some support to the defendants' assertion that they did not intend to deceive the universities. The expert report opined that the value of an athlete to a university generally outweighs the penalties associated with recruiting the athlete in violation of the rules, assuming that the university is caught breaking the rules at all. The jurors were aware of the various sanctions that the NCAA can impose for rule-breaking; such evidence was part of the government's argument that the defendants' conduct harmed the universities by exposing them to the risk of financial loss. The expert report could have provided the jury with the other side of the equation: the myriad of benefits that a university may receive from recruiting and retaining athletes and creating successful sports programs.

With that information, the jury could have inferred that the defendants and the universities, as participants in the system, knew of these benefits and of the limited costs of being caught violating the ostensible rules of the system. The jury might then have concluded that the defendants believed that the universities knew that activities like theirs were very likely occurring within their programs,

12

and deliberately closed their eyes to such activities because the benefits of those actions were very likely to result in a net positive outcome for the schools. The defendants' case rested on *why* they acted the way they did, and this evidence would have been probative as to their intent precisely because it could have helped explain how the world of NCAA recruiting works.

But the evidence could have also been extremely prejudicial. The defense admitted that the report showed that the benefits of breaking NCAA recruitment rules *generally* outweigh the risks, but the report did not address the specific practices of any of the universities involved in this case. The district court aptly noted that highlighting the benefits that universities reap from recruits "would have been likely to turn the jury's focus to the wisdom or fairness of the NCAA rules that were violated." S. App'x at 48. In turn, that focus may have influenced the jury to put the NCAA rules on trial, and if they believed the rules were unreasonable, there would be a substantial risk the jurors would overlook the defendants' fraud, even if the evidence demonstrated that the particular universities involved were trying to run clean programs.

The report also could have pushed the jury towards a finding of "no harm, no foul." As the district court noted, the expert report explains the benefits a

13

university could gain *after* an athlete receives a scholarship to attend the school, "that is *after* the immediate deprivation of property . . . [takes] place." S. App'x at 51. Under the law, it makes no difference whether a victim of fraud ultimately benefits from the immediate loss caused by the fraudulent conduct. *See Calderon*, 944 F.3d at 90 (describing a "no ultimate harm" jury instruction). In other words, if the expert report had been admitted, the jury might have looked to the benefits a university may receive from recruits to excuse the defendants' fraudulent conduct, even though the fact that a victim ultimately profited as a result of the fraud is not a valid excuse for deliberate deceptive conduct.

The district court had to balance these competing concerns. While the report provided some probative value supporting a valid defense, it was prejudicial because it could have shifted focus to the reasonableness of the NCAA rules or to whether the universities ultimately benefitted in the long run. After balancing these issues, the district court found that the report's prejudicial value substantially outweighed its probative value. While the opposite decision might also have been acceptable, I cannot find the district court's decision "arbitrary and irrational." *White*, 692 F.3d at 244 (internal quotation marks omitted). A proper use for the report is specific: to support that the defendants

14

held a belief that the universities *in this case* knew what they were doing. Its improper uses are general: to suggest that the entire system is unfair and universities generally benefit from rules violations even when they are caught. The report's general nature – addressing the system of high-level college athletics as a whole – reduces its probative value as to the particular conduct involved in this case and enhances, rather than diminishes, its prejudicial effect. Thus, the district court was well within its discretion to find that the risk of prejudice in admitting the expert report substantially outweighed its probative value.

B.      *Details of Louisville's Prior Infractions*

The district court also precluded the defense from presenting evidence of Louisville's previous recruiting infractions detailed in an NCAA Committee on Infractions ("COI") decision. The COI found that Louisville provided prospective recruits with exotic dancers and prostitutes during visits to the school. The defendants sought to introduce the COI ruling as proof of their lack of intent to deceive, because Louisville's history of rule-breaking may have persuaded the jury that the school tolerated such conduct. Instead, the court allowed the defendants to introduce a stipulation indicating that Louisville "committed Level I-Aggravated violations," which are violations that "seriously undermine[] or

15

threaten[] the integrity of the NCAA Collegiate Model." App'x at 1167. The stipulation confirmed that Louisville was sanctioned for the violation. In the court's view, the stipulation allowed the defendants to make their argument – that they genuinely did not believe they were defrauding Louisville because the school had previously violated the same rules that the defendants violated – without showing the jury the specific details in the COI decision.

The defendants argue that precluding them for introducing the specific violation outlined in the COI ruling prevented them from showing that Louisville's prior violations were far more serious than the payments at issue in this case. The defendants wanted to show the jury that Louisville committed extreme violations and did not suffer much from those violations. That the defendants knew of these more extreme violations made it more likely that they believed that Louisville condoned their payments to the families of recruits.

But that the details in the COI report are more *salacious* than those in this case does not necessarily make those violations more extreme from the standpoint of the NCAA. Moreover, rewarding teen-aged recruits with sexual favors is sufficiently repulsive that the jurors might recoil viscerally from such practices, *perceive* the violation as morally worse than providing financial support

16

for the athletes' hard-pressed families, and judge the universities harshly and the defendants minor violators in comparison. Reasonable minds can differ about whether this kind of prejudicial effect is so overwhelming as to justify excluding the evidence, but the district court's ruling was entirely reasonable and far from "arbitrary and irrational." *White*, 692 F.3d at 244 (internal quotation marks omitted). The defendants were able to argue that Louisville committed Level I-Aggravated violations without focusing the jury on the sordid details of the actual report, which may have influenced the jury in ways that were not relevant to the trial.[1]

### C. *NCAA Reinstatement Guidelines*

I would also affirm the district court's decision to exclude evidence that could have rebutted the testimony of the compliance officers of the victim universities. The compliance officers testified that they would not have allowed

---

[1] The district court also excluded the COI report because the decision was merely "somebody's opinion of what the facts were." App'x at 153. The COI decision, however, was relevant only insofar as it was probative as to the defendants' intent; whether the COI's findings were correct or not does not affect the defendants' perception of those findings. If defendants knew about the report, the fact that it may have been incorrect in whole or in part does not matter as to what makes its findings relevant. Although the district court was within its discretion to exclude the evidence under Rule 403, the court's conclusion that the "decision itself was not a fact," Majority Op. at 31, does not affect its admissibility.

17

awarding a scholarship to an ineligible athlete. The government wanted to show the jury that the universities typically followed the NCAA rules, and the defendants sought to introduce evidence that, in reality, the schools took calculated risks and awarded scholarships to elite recruits who they knew would be ineligible for competition for some portion of the season as a result.

The district court excluded the NCAA's "Student-Athlete Reinstatement Guidelines" and the defendants' attempts to cross-examine the compliance officers as to those guidelines. The guidelines provide for forfeiture of 30% of the regular season as the maximum penalty for an athlete who has violated recruiting rules. Thus, the maximum penalty would allow a rule-breaker to be reinstated after missing only early-season games. And that is the *maximum* punishment; the NCAA may give a shorter punishment to an athlete whose culpability was mitigated in some way. The defendants argue that these guidelines show that a school risks very little in recruiting an ineligible athlete. The lack of any real punishment made it more likely that the universities approved of the defendants' actions because they would benefit more from the presence of the athlete than they would be hurt by the penalty if the payments were discovered.

The district court excluded the guidelines and limited cross-examination in part because it found that the evidence was not relevant. The district court was correct to the extent that evidence that a financially motivated university might rationally take a calculated risk to violate the rules in pursuit of the rewards of a successful program would not show that a particular university was not, objectively, deceived and defrauded, because a school cannot take a calculated risk in recruiting an ineligible athlete unless it is privy to that risk. But the evidence would have been relevant to the defendants' state of mind, that is, as to whether they genuinely believed that the universities approved of the defendants' conduct, because the fact that there was little financial risk involved in breaking the rules made it more likely that the university would approve of rule-breaking. So the guidelines had some relevance to a valid defense.

Nevertheless, it was again within the district court's discretion to exclude the guidelines and limit the defendants' cross-examination because the risk that the evidence would lead the jury to consider an invalid defense substantially outweighed its limited probative value. The guidelines do not show that the compliance officers who testified were lying when they testified to their own efforts to enforce the NCAA rules, nor do they show that the defendants had any

19

reason to believe that these *particular* universities wanted them to violate those rules. Instead, the guidelines could be taken to suggest that the NCAA system is a kind of sham, because universities aren't *really* on the hook for violations committed by people like defendants: the student-athlete may suffer in the short term, but the universities don't. Such evidence may support the general idea that the NCAA and the universities are the real bad guys here, but that argument diverts the jury from the legitimate defense that the defendants thought their activities were condoned by the victim universities.

## III. Phone Calls Involving Defendants and Coaches

The district court also excluded several phone calls that the defendants argue would have helped them prove that they did not intend to defraud the universities in this case. These conversations present the most difficult issues in this appeal. The defendants challenge the district court's rulings as to only a few of those calls. Though the majority gives short shrift to the defendants' arguments, the calls present close questions as to whether the district court erred in excluding them. As to certain of the calls, indeed, I conclude that the evidence should have been admitted.

### A. The Call Between Code and Dawkins

First, the district court excluded a phone call between defendants Merl Code and Christian Dawkins, in which they discussed their understanding that the family of a recruit was asking Kansas for money before committing to play basketball at the school. During the call, Code and Dawkins agree that paying the athlete "has to be worth it for the school . . . for the money they'll make off [of the athlete]." App'x at 1707. Although the athlete being discussed was not implicated in the scheme charged in the indictment, the defendants contend that the call was relevant because it demonstrated that they believed the universities were happy to violate the rules if they received valuable players for their teams.

The majority characterizes the call as irrelevant, because it did not concern any of the recruits in the case and occurred after the defendants made the payments at issue. But the conversation clearly reflected how Code and Dawkins viewed the world of NCAA recruiting, and it strikes me as a strained assumption that these views had somehow developed in the few weeks between the time that the defendants made the last of the payments and the date of this conversation. The defense here is that the defendants *believed* that they were not deceiving the universities, and the phone call had some probative value as to that belief.

But we are back to the balancing act that the district court was obligated to

21

apply throughout this trial. The call may have had some probative value as to the defendants' general states of mind, but that probative value is limited and partial. To the extent the call could be taken to suggest what the defendants believed the universities wanted, any reflection of that belief is inferential: the defendants' belief in the great financial value to Kansas of the presence of a particular recruit might lead one to infer that they thought the universities wanted their apparel company to make whatever payments were necessary to induce certain athletes to commit to the universities.

A more direct inference, however, is that the defendants believed simply that what they were doing would benefit Kansas in the long run. The defendants do not state that they thought that Kansas officials were aware of or approved of the payments being demanded by the recruit being discussed, let alone that they thought the university was aware of or would approve of the payments made to the Kansas recruit whose family they themselves paid. In fact, they do not reference the payments at issue in this case at all during this conversation.

While I find the issue closer than the majority does, in the end, it was reasonable for the district court to conclude that a conversation showing that the defendants believed that universities generally benefit from rule-breaking is too

22

distant from the issue at the heart of this case – whether the defendants genuinely believed that these specific victim schools knew and condoned what they were doing – and too proximate to the invalid defense that they were deceiving Kansas officials for their own good. Evidence of such a belief may confuse the jury about what is and what is not a proper defense, and generates precisely the kind of prejudice the district court was trying to avoid.

### B.     Calls Between Defendants and Coaches

The district court also excluded certain calls between a defendant and a representative of a school. The defendants argue that these calls corroborated their claim "that the basketball coaches at the Universities specifically asked them to break NCAA rules" and helped refute testimony from a witness who testified that Kansas basketball coaches "wouldn't have liked it very much" if they had been told of the payments to the recruits' families. Appellants' Br. at 116. The district court excluded the calls as irrelevant and prejudicial, and the majority lumps them together and upholds the district court's decision.

I agree that one call was properly excluded because it involves a coach from a school that is not involved in this case – and indeed, defendants themselves do not challenge the exclusion of this call on appeal. In that call, the

coach tells Dawkins that he "can get [Dawkins] what [he] need[s]" to secure a recruit. App'x at 1687. The call may have fueled defendants' good faith belief in the cynical proposition that "all the universities do it; they just don't want to be told about it." But, as the majority says, the risk of prejudice associated with admitting a call about miscellaneous cheating at *another* school to tar the victims in this case, or to intimate that the alleged victims *in this case* held the views that the defendants claim they attributed to universities, is a bridge too far. It would divert the focus of the trial from whether the victims here were defrauded to whether the jury should believe that college athletics is rife with corruption.

But two of the excluded calls involved coaches from the universities in this case, and the majority glosses over the probative value of those calls. In one, Dawkins and a Louisville assistant coach discussed a recent business dinner the coach had attended where one of his associates "was trying to pick [his] brain on [Dawkins]." *Id*. at 1717. The coach told the associate that he "[doesn't] really talk about" his and Dawkins's relationship; he keeps that connection "off the book[s]." *Id*. In another call, a Kansas assistant coach called Code to discuss a different recruit who is not implicated in the conduct charged in this case. In that call, the coach described the recruit's family "ask[ing] about some stuff." *Id*. at

24

1713. The coach told the family "we'll talk about that if you decide [to come to Kansas]." *Id*. The coach then told Code "I've got to just try to work and figure out a way. Because if that's what it takes to get him[,] . . . we're going to have to do it some way." *Id*. The coach stated that he would "talk with Jimmy [Gatto]" about funneling money to the family through an amateur team. *Id*. at 1714. Code says he will "talk to Jim today too." *Id*. The coach then described how he might also ask Gatto to help pay for the recruit's brother to visit Kansas despite acknowledging "not [being] allowed to pay for it." *Id*. at 1715.

The majority gives two reasons why these calls should be excluded. First, the calls would "confuse[] the jury, as it would have required the jury to learn about individuals not involved in the case." Majority Op. at 28-29. Alternatively, the majority would hold that the calls were irrelevant because they could not support a valid defense unless the coaches were "unconflicted and acting in good faith." *Id*. at 29. Neither reason is persuasive.

As to the first reason, I would have more confidence in the jury. The government was concerned that the calls involved people that the jury had not heard about. But the calls were not overly complicated; they involved two defendants and two coaches from victim schools discussing top basketball

25

recruits. If the calls would have "required the jury to learn about individuals not involved in the case," Majority Op. at 28-29, surely the number of such individuals was not so large as to justify excluding otherwise relevant evidence because the calls mentioned a few individuals who were not a part of the charged conduct.

As to the second reason, the majority makes inferences best left for the jury to decide. The majority notes that the calls are probative of a valid defense only if the coaches on the calls were "unconflicted and acting in good faith" on behalf of their university, *United States v. D'Amato*, 39 F.3d 1249, 1258 (2d Cir. 1994), but that is not technically correct. Rather, the calls support a valid defense if the defendants have a good faith *belief* that the coaches "appear[] to be unconflicted and acting in good faith" regardless of whether the coaches are actually in conflict with their schools. *Id*. at 1257-58. These calls could very well have helped the jury infer such a good faith belief. The first call could have supported the inference that Dawkins genuinely believed that, while Louisville did not want the defendants' malfeasance advertised to the public, the school tacitly condoned the rule-breaking, so long as it was kept "off the book[s]." App'x at 1717. The second made it more likely that Code and Gatto believed Kansas officials expected to get

26

recruits in ways that violate the NCAA rules because the call is itself an example of a Kansas official doing just that.[2]

The government argues that conversations with assistant coaches inherently lack probative value, because the coaches themselves were lower level employees who had their own reasons to circumvent the universities' policies – they wanted to keep their jobs by fielding winning teams, giving them a motive to violate NCAA recruiting rules themselves or to wink at violations by others, whether or not the highest officials of the universities sincerely demanded that the coaches operate within the rules. But to give blanket credence to this argument seems to me overly simplistic. If the coaches believed that they needed to win to retain their jobs, their financial incentive aligned with that of the universities in fielding a winning team, and the pressure on them to win or be fired emanated from the officials who publicly professed a commitment to compliance. The assistant coaches cannot simply be written off as minor functionaries. Wherever they ranked on an organization chart, they were

---

[2] The district court also excluded the calls because they occurred after a majority of the alleged payments were made and were therefore not relevant to the defendants' state of mind at the time those payments were made. But the timing is very close, and the conversations provide insight into the minds of these defendants. Given the proximity in time, that the calls occurred a few weeks after the payments at issue does not mean that they are irrelevant to the defendants' state of mind at the time the payments were made.

essentially the contact persons for the defendants, who were their counterparts at the apparel company. If they were implicated in the defendants' activities, even as they insisted on hiding their approval, a jury could reasonably have inferred that the defendants held a good faith belief that the attitudes of these coaches reflected the view of the universities involved. Whether the assistant coaches were too low in the hierarchy for a reasonable person in Code's or Dawkins's position to infer that they spoke for the university is a judgment for the jury to make, and the jury was not allowed to hear the calls to decide what inferences to draw.

The evidence from which the majority infers that these coaches were *not* unconflicted and were acting in bad faith should have been left to the jury. The majority cites a conversation between Code and Dawkins in which they reference their understanding that Head Coach Rick Pitino of Louisville wanted "plausible deniability" about recruiting infractions. *Id*. at 640. But that Pitino wanted plausible deniability does not necessarily mean that he knew Louisville would not tolerate cheating. It could equally well mean that he was speaking for the university itself, which (the defendants' theory held) wanted to get winning players but also wanted precisely such deniability. *Id*.

The majority also cites the coaches' conduct on two of the excluded calls as indicative of conflict. In one call, the coach closed his door while talking on the phone. In another, the coach made statements about keeping his relationship with Dawkins off the books. But while these actions could be construed, as the majority interprets them, as "cut[ting] against any argument that the coaches were unconflicted and acting in good faith," Majority Op. at 29, they could also have indicated that the universities wanted deniability as to impropriety that they condoned. It all depends on from whom the coaches wanted to keep things secret. A reasonable jury could infer that the coaches were afraid not that the universities would disapprove of their condoning the defendants' conduct, but that the coaches knew – as defendants argued – that the universities could not tolerate *having it known* that they were condoning it. This is a subtle but important distinction. A coach would not be conflicted if he was doing exactly what the university wanted: winking at the defendants' off-the-books payments to players' families, but preserving the façade that he was not involved and did not know what was going on.

Aside from these calls' probative value as to the defendants' intent, the defendants argue that it would have also called into question the testimony of a

29

cooperating witness – another company representative, Thomas Joseph Gassnola – who testified that he would not have told Kansas officials that he paid a recruit's family because "[the university] wouldn't have liked it very much." App'x at 293. The majority does not believe that these calls would contradict Gassnola's testimony because, in their view, the calls showed that the coaches "knew what they were doing was wrong." Majority Op. at 30. But "wrong" is a treacherous word in this context. Of course, the payments were "wrong" insofar as they violated NCAA rules, and anyone, from the defendants to the coaches to the university presidents, who tacitly or overtly condoned such payments would not want that information to become publicly known. But that the coaches – and the defendants – knew that what they were doing violated NCAA rules, does not mean that they knew that high-level university policy-makers were genuinely disapproving of the payments. Kings who would like "meddlesome priest[s]" disposed of[3] generally would not be happy to have those who take the hint report

---

[3] The remark attributed to King Henry II of England, in reference to Archbishop Thomas Becket derives from various chronicles and is formulated in different ways in the historical sources and in literary works derived from them. The most famous formulation, "Will no one rid me of this meddlesome priest?" comes from Edward Anhalt's screenplay for the 1964 film *Becket*, based on a play by Jean Anouilh, which uses a slightly different version of the remark. Whatever degree of plausible deniability the King may have thought he had did not keep him from later regretting, and doing penance for, the resulting murder of Becket, and has not saved him from the verdict of history as to his responsibility for the act.

back overtly about what they had done.

It would not be necessary for a jury to conclude that, or even to entertain reasonable doubt as to whether, the highest university officials were *in fact* as hypocritical as the defendants professed to believe they were. The excluded calls reflect conversations that the defendants had with university representatives at their own level of contact that could lead a reasonable person in defendants' position to believe that those officials were speaking for their employers in condoning the rule-breaking. The defense's argument was that the defendants *really did believe* that this was the case. Even if it heard the excluded calls, the jury could have rejected that defense and found that the defendants and the coaches with whom they dealt were guided by their own self-interest. But it could also have inferred that, under all the circumstances, there was reasonable doubt about whether the defendants believed that the universities simply preferred not to be told what was happening. These are issues that go to the heart of the defense, and the jury should have been permitted to draw its own conclusions from this evidence, which reflected actual discussions between defendants and representatives of the "victimized" schools. Thus, the district court's conclusion that these two calls were irrelevant was erroneous.

But was the probative value of these two calls high enough to make the district court's decision under Rule 403 arbitrary and irrational? In the first call, the coach implied that his relationship with Dawkins was something that he needed to hide by keeping it "off the book[s]." App'x at 1717. On the call, the coach referred to Louisville's success in recruiting "five-stars" that year and opined that this was the "[b]est class in Coach Pitino's history." *Id*. at 1719. Dawkins then replies "[o]n the heels of a . . . whore scandal," referencing the misconduct reported in the COI findings. *Id*. The call did not directly implicate the assistant coach (or Louisville) in Dawkins's rule-breaking. The coach did not say, for example, that he kept his relationship with Dawkins off the books because Dawkins was assisting his team to recruit players in ways that broke NCAA rules – though of course the jury could have certainly inferred as much from the call. The call's probative value is also reduced by the fact that the coach in question was only a young assistant, far removed from the policy-making apparatus of the university.

Still, the conversation cannot be considered mere evidence of generalized corruption in college athletics. It involves statements made to one of the defendants by a basketball coach who was a key point of contact for that

32

defendant with Louisville. If the government is going to prosecute people at Dawkins's level, who are not likely to have direct contact with university presidents, athletic directors, or even head coaches, excluding evidence of what such defendants were told by university officials at their own level cannot be justified.

In the second call, an assistant coach from Kansas directly discussed rule-breaking with Code, though the recruit at issue was not implicated in the conduct charged in this case. The coach said that he needed "to figure out a way" to get money and housing for a recruit's family, and admitted that he would have to route the money through a third party to avoid detection by the NCAA. *Id*. at 1713. The coach then mentioned that he would talk with Jimmy Gatto – another defendant in this case – about how to get the money to the family. Surely a conversation in which a coach from a victim university discusses with one defendant soliciting help from another defendant to break the NCAA rules would be extremely relevant to whether those defendants believe that the university the coach represents condones such rule-breaking.

On the one hand, the defendants' case hinged on showing that they believed they were not deceiving the universities, but they had few opportunities

33

to make their case to the jury. On the other hand, the government was able to prove intent from "the scheme itself" if "the necessary result of the . . . scheme [was] to injure others." *D'Amato*, 39 F.3d at 1257 (internal quotation marks omitted). Thus, the probative value of these calls, when considering that the central defense was to challenge scienter, was high. Though these are close and difficult judgments to make, I respectfully conclude that the district court's evidentiary rulings failed to appreciate the substantial probative value of these calls. In fact, the district court concluded – and the majority agrees – that the calls had little to no relevance to a valid defense in the first instance. In so doing, the district court "obviated the need for [a Rule 403] balancing and cast doubt as to the balancing made" by "shifting the . . . balancing test considerably in the Government's favor." *White*, 692 F.3d at 247. Thus, I would conclude that excluding the calls exceeded the wide bounds of the district court's discretion to exclude evidence under Rule 403.

## IV.    Harmless Error

That conclusion does not end our inquiry, however. We will not overturn a conviction if the error was harmless. A harmless evidentiary exclusion is one in which "we can conclude with fair assurance . . . did not substantially influence

34

the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133 (2d Cir. 2010) (internal quotation marks omitted). Thus, we will still affirm if it is "highly probable that the error did not affect the verdict." *United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018) (internal quotation marks omitted).

As a preliminary matter, the excluded calls would not logically affect Code's convictions for wire fraud against Louisville and conspiracy to commit wire fraud. The erroneously excluded call between Code and the assistant coach from Kansas is harmless as to Code because it is not likely that the call would influence the jury's conclusion on Code's intent to deceive Louisville. There is no evidence that Code knew of the call between Dawkins and the Louisville coach, so there is no reason to believe that the other excluded call would have substantially influenced the jury's verdict on that count. Finally, the errors would not affect Code's conviction for conspiracy because his conviction for wire fraud coupled with the government's ample proof of the existence of a conspiracy supports his conviction on the conspiracy count. *See Calderon*, 944 F.3d at 92.

Whether the errors affected Gatto's or Dawkins's convictions is a closer question. Gatto was convicted of three counts: wire fraud as to Louisville and Kansas and conspiracy to commit wire fraud. Dawkins, like Code, was charged

35

and convicted for wire fraud as to Louisville and conspiracy to commit wire fraud. The erroneously excluded call between Dawkins and the Louisville coach was directly relevant to his understanding of the expectations of that university, and the call between Code and the Kansas coach may have influenced the jury's verdict as to Gatto because the call was probative of Gatto's intent to deceive Kansas.

When assessing whether improperly excluded evidence was harmless error, we consider, inter alia, the importance of the evidence to the defense, whether the evidence is cumulative, and the strength of the government's case on the factual issue. *Oluwanisola*, 605 F.3d at 134. "[T]he strength of the government's case is the most critical factor in assessing whether the error was harmless." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009).

The government's evidence on fraudulent intent was not anemic. The jury was allowed to infer "fraudulent intent . . . from the scheme itself." *D'Amato*, 39 F.3d at 1257. The government supported that inference by presenting evidence tending to indicate that Louisville, Kansas, and North Carolina followed NCAA rules. Compliance officers from each university testified that they enforced – and trained their staff and players to comply with – NCAA rules because the NCAA

36

would penalize the universities or their coaches for any violations. Gassnola testified that Kansas's coaches "wouldn't have liked it" if he let them know that the defendants were paying money to the families of recruits, presumably to support the inference that the defendants knew that the schools did not approve of their conduct. App'x at 293. The government used its closing argument to stress that the defendants endeavored to conceal their actions at every turn: they used burner phones, made payments using cash and multiple bank accounts, and discussed the need to be careful when talking around others. In sum, the government's case centered on circumstantial evidence that could indicate to a jury that the defendants' arguments that they did not intend to deceive the universities were unpersuasive. The jury agreed with the government after deliberating for less than three days.

But the government's evidence could have also supported the defendants' theory that they wanted to hide their payments from the NCAA, while being careful to give the universities plausible deniability by not discussing their actions openly with certain university officials. That the schools had compliance officers to enforce NCAA rules, and that a university "wouldn't have liked it" if it knew that the defendants were paying money to a recruit's family, does not

directly negate that theory because the defendants' job was to keep the rule-breaking under wraps from all parties, including the universities themselves. That does not mean, however, that the universities were deceived if they were in fact indifferent to whether rules were broken, so long as the violations were sufficiently hidden from the university's leadership, the NCAA, and the public. And crucially, the jury did not need to agree that what the defendants believed was happening was, in fact, happening. The defense simply needed to create reasonable doubt as to the defendants' *belief* about what the universities knew about their scheme.

I cannot find, with high probability, that the district court's exclusion of the call between Code and the assistant coach from Kansas did not affect Gatto's conviction for wire fraud as to Kansas. *Stewart*, 907 F.3d at 688. In the call, the coach admitted that he knew that paying for a recruit's brother to visit the school violated the NCAA rules, yet he planned to ask "Jimmy" for help in routing funds to the family through an amateur team, all in the hopes of getting the recruit to eventually commit to Kansas because "it's [his] job" to do so. App'x at 1715. Had the jury heard this call, it may have believed that the coach did call Gatto to ask him to provide the money. In turn, that would make it more likely

that Gatto genuinely did not intend to defraud Kansas by his actions at issue in this case. Of course, just because a coach at the school asked Gatto to break the NCAA rules in one instance does not mean that the university condoned or approved of such rule breaking in others, but it does make it more likely that Gatto believed that he was not defrauding Kansas. Given that Gatto exercised his right not to testify at trial, the call would have been critical to understanding what was in Gatto's mind near the time that these payments were made. By excluding the call, the district court may have substantially affected the jury's decision to find Gatto guilty of wire fraud as to Kansas.

The error, however, was harmless as to Gatto's convictions for wire fraud against Louisville and conspiracy to commit wire fraud. As the defense admitted in closing, the jury heard evidence that Gatto called Coach Pitino after Code asked Gatto to route money to a Louisville recruit. The defense argued that the only reason Gatto would call Coach Pitino immediately after receiving this request would be to ask him if that is what he (and Louisville) wanted, but the jury rejected that theory. The excluded call between Code and the Kansas coach would not have provided the jury with anything more to help them find that Gatto did not intend to deceive Louisville, and there is no reason to believe that

39

Gatto knew of the excluded call between Dawkins and Louisville. Because Gatto's conviction for wire fraud as to Louisville was not affected by the excluded calls, that conviction stands. Given Gatto's substantive conviction, the jury's verdict convicting him of conspiracy to commit wire fraud also stands.

The district court's exclusion of the call between Dawkins and the assistant coach from Louisville was not harmless as to Dawkins's convictions, however. The government argues that there was "overwhelming evidence" that Dawkins knew that Louisville did not approve of the payments because he admitted that they "could not be disclosed to the Universities (or coaches)." Appellee's Br. at 75. The call discussing Pitino's "plausible deniability, App'x at 640, and Dawkins's admission that he "would never tell Rick [Pitino] anything . . . because I don't want to put him in jeopardy," Supp. App'x at 142, could support an inference that Dawkins knew that Coach Pitino and Louisville did not want him to make the payments at issue in this case. But if the excluded call showing a coach from Louisville describing his relationship with Dawkins as "off the books" was shown to the jury, App'x at 1718, that might have changed the jury's perspective on Dawkins's argument that he was trying to give Pitino and

40

Louisville plausible deniability in the event of an NCAA investigation, despite their knowing full well what was occurring. Because Dawkins too exercised his right not to testify, this call was a crucial piece of evidence that could have helped support the defense's theory about intent when little other evidence was available.

In excluding the call, the district court may have substantially affected the jury's decision to find Dawkins guilty of wire fraud as to Louisville, and the error also necessarily affected Dawkins's conviction on the conspiracy count. To support a conviction for conspiracy to commit wire fraud, the government has the burden of proving "that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007). Thus, to find Dawkins guilty of conspiracy, the jury must have found that he intended to defraud a victim university. Given that the district court's error may have influenced the jury's decision as to Dawkins's intent to deceive Louisville, and given that there was no evidence that Dawkins intended to defraud any other victim university, I cannot conclude with confidence that his conviction for conspiracy was not substantially affected by the evidentiary exclusion. By excluding the calls, the district court erroneously

deprived Gatto and Dawkins of a fair opportunity to convince the jury that they did not intend to deceive the victim universities. Thus, I would overturn Gatto's conviction on count three and Dawkins's convictions on counts one and two.

* * *

I fear I have belabored the evidentiary issues in this case at undue length. For the most part, I agree with the majority's bottom line: the nature of the prosecution confronted the able district judge with a series of delicate and difficult evidentiary problems, to which the judge for the most part made reasonable, if not indisputable, responses. In many cases, it is easy to police a line between evidence that supports a defendant's good faith and evidence that merely attacks the reputation or probity of the victims. In this case, however, the vices with which defendants sought to tar the alleged victims were not extraneous to the alleged fraud. This was not a case in which the defendants sought to prove that their victims had done bad things that had little or nothing to do with the scheme of which defendants were accused, but which might make a jury feel that the defendants were unworthy of the law's protection.

Here, the defendants' argument was that the things the government said

they stole from the universities – the scholarship money provided to the athletes and the university's ability to comply with NCAA rules and avoid penalties – were things that they reasonably believed the universities were in fact happy enough to give up in the pursuit of greater financial benefit. The defendants claimed to believe that by not openly acknowledging the rules violations they committed, they were deceiving no one, because the universities in fact knew that such violations happened regularly. The universities did not know of the specific payments made by these particular defendants not because the defendants pulled the wool over the victims' eyes, but because the alleged victims desired not to know too much, in order to preserve a hypocritical pretense of compliance while pursuing the financial and reputational benefits of maintaining successful athletic programs without paying the athletes whose skills and hard work generate the profits that go to the adult coaches and schools.

Such a cynical theory may be a caricature of how college sports are in fact conducted. No doubt many university officials and athletic coaches genuinely attempt to comply with rules derived from a model of amateurism that some others desecrate, and that is difficult to maintain in a world where winning games and making money can come to be seen as the highest goals. To whatever

extent the defendants' professed beliefs correspond to reality, evidence to that effect would be difficult to come by; the essence of the defense is that the universities *pretended* to want to run clean programs, and that this pretense required those who funneled payments to hard-pressed families of student athletes to operate in secret, *as if* they were deceiving universities that themselves were trying to hide what makes their programs successful. And in the absence of evidence directly supporting their claims, defendants fell back on evidence that provides only limited, indirect support for their specific theory, and that does so by painting a grim picture of widespread corruption and hypocrisy without quite engaging the government's evidence suggesting that at least these particular victims were genuinely defrauded.

The district court was ultimately right to try to prevent the defendants from putting the entire NCAA system on trial for its exploitation of athletes under circumstances that make violations of the sort in which these defendants engaged all but inevitable, or even to appear morally justified in providing some recompense to those whose labor generates the money that enriches others. Whatever value such a trial might have in the court of public opinion, and however such a "defense" might affect the wise judgment of prosecutors as to

what cases are worth the expenditure of significant law enforcement resources, the legal issues in a case like this are far narrower.

By the same token, a venture into the underside of college athletic recruiting opens up significant questions about the motivations and beliefs of the participants. We should be particularly careful not to sweep too broadly in declaring out of bounds evidence that does indeed support the defendants' claims about what they believed. The cynicism of their claimed beliefs does not do them much credit, but on this record one is left with a queasy feeling that the deeper cynicism may be in the system within which they operate.

People like the defendants operate at the seamiest margin of amateur sports. They (and the athletes and their families who succumb to their offers) are violating the rules by which the universities, cynically or sincerely, have agreed to be bound – rules of which the athletes are well aware, and with which they are required to represent that they have complied. And such violations are not victimless. Only a few athletes have the talent to skip the college game and succeed at the highest professional level. A few more are realistic candidates for such success, if they are properly trained and groomed by the opportunity to compete in college programs. Most who compete in college have an opportunity

to earn a degree that will stand them in good stead even if they do not play professional sports – but only if they can pay for their education with their labor on behalf of the school's teams. But all are vulnerable to losing those scholarships, and having their vocational training disrupted, if they are publicly known to have violated the rules. Whether or not those who bribe aspiring athletes to sign onto a particular college's basketball program have defrauded the universities, they expose the youthful athletes to a high degree of risk.

It is not for judges to decide whether it makes sense to use federal law enforcement revenues to pursue the relatively low-level agents of corruption in this system. Our only responsibility is to decide whether the defendants have been tried and convicted on the charges brought against them in accordance with the law, including the applicable rules of evidence. The questions in this case are very close, and the experienced trial judge and my colleagues on this panel have honorably applied the governing rules. Our disagreements are narrow, and involve only a few of the many close evidentiary calls forced on the judge by the nature of the charges. Nevertheless, for the reasons set forth above, I respectfully dissent from those portions of the majority opinion that uphold those rulings that I find erroneous and prejudicial, and from the judgment of the court insofar as it

affirms Gatto's conviction on count three and Dawkins's convictions on counts

one and two.